**UNITED STATES of America, Appellee,**

v.

**NEW BUFFALO AMUSEMENT CORP., Aquarius Releasing, Inc., and Terry Levene, Appellants.**

No. 444, Docket 78–1317.

United States Court of Appeals, Second Circuit.

Argued Dec. 12, 1978.

Decided May 22, 1979.

Alan M. Dershowitz, Cambridge, Mass., and Jeanne Baker, Cambridge, Mass. (Rosenberg, Baker & Fine, Cambridge, Mass., on brief), for appellants.

Roger P. Williams, Asst. U. S. Atty., Buffalo, N. Y., Richard J. Arcara, U. S. Atty. for the Western District of New York, Buffalo, N. Y., for appellee.

Before MANSFIELD and OAKES, Circuit Judges, and BARTELS, District Judge.*

BARTELS, District Judge:

Appellant Levene owns and operates several corporations which produce, distribute, and exhibit motion pictures. Appellant Aquarius Releasing, Inc. ("Aquarius"), an entertainment corporation of which Levene is sole stockholder and president, acquired and produced the allegedly obscene film involved here entitled "Belinda." The other corporate appellant, New Buffalo Amusement Corp. ("New Buffalo"), is a subsidiary of Loew's Theatres, Inc., and is the operator of the theater in Buffalo, New York, at which the movie in question was shown.

Under the four-count indictment which initiated this action, filed on May 2, 1973, against appellants Levene, Aquarius, New Buffalo, and various other defendants not involved in this appeal,[1] Levene and Aquar-

---

* Of the Eastern District of New York, sitting by designation.

1. Other defendants named in the indictment were Loews Corporation, Loews Theatres, Inc., Frank Arena, and Benjamin Franklin Abrams, Jr. The first count of the indictment—on which appellants Levene and Aquarius Releasing were convicted—charged that all the defendants did "knowingly, willfully and unlawfully transport in interstate commerce, by means of common carriers, from the State of New Jersey to the City of Buffalo," an obscene film, in violation of 18 U.S.C. § 1462. The second count—under which New Buffalo Amusement Corp. was convicted—charged that all defendants, except Levene and Aquarius, did "willfully, knowingly and unlawfully cause to be taken from a common carrier" an obscene film, also in violation of 18 U.S.C. § 1462. The third count charged a conspiracy to commit the substantive crimes charged in counts one and two, and the fourth count charged a conspiracy to commit the substantive crime of using the mails for mailing an obscene trailer, in violation of 18 U.S.C. § 1461.

ius were convicted of knowingly using a common carrier for carriage in interstate commerce of an obscene film, and New Buffalo was convicted of knowingly taking the same film from the common carrier, both offenses in violation of 18 U.S.C. §§ 1462 and 2.[2] The judgments of conviction were entered on July 25, 1978 after a jury trial in the United States District Court for the Western District of New York, Curtin, *J.* This is an appeal from those judgments.

Appellants have asserted many grounds for reversal, including the claim that they were denied their rights to a speedy trial under the various speedy trial plans of the Western District of New York[3] and under the Sixth Amendment. Since we reverse on the ground of the denial of appellants' Sixth Amendment rights to a speedy trial, we need limit ourselves only to the speedy trial contentions.

■ While we realize that delay alone is insufficient to constitute a Sixth Amendment violation, a chronological history of the delays in the prosecution of this action, for which the appellants must assume some of the responsibility, reflects an official indifference to the necessity of a speedy trial as required by the applicable Western District Plans and by the Constitution. Although the indictment was filed on May 2, 1973 and appellants moved for dismissal on speedy trial grounds on June 1, 1976,[4] it was not until October 12, 1977 that a jury was finally empanelled, and even then the trial was postponed until November 15, 1977, approximately four and one-half years after the date of indictment. Although various contentions have been made by the government in explanation of this extensive delay, we find no dispute as to the actual facts as reflected by the record or the docket sheet. For the sake of clarity a table summarizing the periods of delay is annexed hereto as an appendix.

Appellants have specified the alleged violations of their speedy trial rights according to the different time periods covered by (1) the applicable Western District Plans Regarding Prompt Disposition of Criminal Cases (April 1, 1973 to July 1, 1976), passed pursuant to Rule 50(b) of the Federal Rules of Criminal Procedure; (2) the Western District's New Plan for Prompt Disposition of Criminal Cases, promulgated pursuant to the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161 *et seq.* (July 1, 1976 to July 1, 1979); and (3) the Sixth Amendment speedy trial clause. Accordingly, the extent and effect of the delay involved can best be presented by a discussion of the lapse of time under each Plan.

## I. WESTERN DISTRICT'S RULE 50(b) PLANS

Appellants' first contention is predicated upon a violation of Rule 4 of the Western

---

**2.** Section 1462 of Title 18 of the United States Code provides, in pertinent part, as follows:

> Whoever . . . knowingly uses any express company or other common carrier, for carriage in interstate or foreign commerce—
>   (a) any obscene, lewd, lascivious, or filthy . . . motion picture film . . . ; or

> Whoever knowingly takes from such express company or other common carrier any matter or thing the carriage of which is herein made unlawful—
>   Shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense and shall be fined not more than $10,000 or imprisoned not more than 10 years, or both, for each such offense thereafter.

**3.** The Western District's Plan Regarding Prompt Disposition of Criminal Cases, adopted pursuant to Rule 50(b) of the Federal Rules of Criminal Procedure, became effective on April 1, 1973. That Plan remained in effect until September 29, 1975, when it was superseded by the Western District's Interim Plan, adopted pursuant to Rule 50(b) and "in conformity with the provisions of the Speedy Trial Act of 1974." Interim Plan, p. 1. This Interim Plan was superseded on July 1, 1976 by the Western District's New Plan, promulgated pursuant to the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161 *et seq.*, and this New Plan will remain in effect until July 1, 1979.

**4.** The trial judge denied appellants' motion on June 23, 1976 and again, after reconsideration, on August 4, 1976. The latter denial was immediately appealed, but on September 14, 1976 —before any briefs on the merits were filed— this court dismissed the appeal on the ground that the trial court's order was not final and, therefore, was non-appealable.

District's Rule 50(b) Plan, effective April 1, 1973. While this Plan was superseded on September 29, 1975 by the Western District's Interim Rule 50(b) Plan, for all purposes relevant here the plans are identical, and the pertinent provision reads as follows:

> In all cases the government must be ready for trial within six months from the date of arrest, service of summons, detention, or the filing of a complaint or of a formal charge upon which the defendant is to be tried.

The necessary inquiry, therefore, is whether the government was ready for trial within six months after date of indictment, exclusive of any periods of excludable delay. Appellants claim that the government was required to signify its readiness for trial by filing a timely notice of readiness in writing and that it failed to fulfill that obligation in this case.

■ To determine the effective timetable, we proceed to the excludable periods which extend the six-month deadline beyond the initial expiration date of November 2, 1973 in this case. In his opinion of August 4, 1976 denying appellants' speedy trial motions, Judge Curtin found—and the parties concede—that the initial fourteen and one-half months from May 2, 1973 to July 15, 1974 were consumed by the hearing and consideration of pretrial motions. Under Rule 5(a) of the Plan, this period, during which motions were *sub judice*, must be excluded.[5] From July 16 to November 1, 1974, the government took no action, and, therefore, it must be charged with this three and one-half month delay.

■ On November 1, 1974, the United States Attorney sent a notice to defense counsel and the court placing the matter on the trial calendar to set a date for trial. If this motion could properly be treated as a notice of readiness, the government should be given the benefit of the November 1 date. However, this procedure was not in accordance with the accepted Western District practice of filing a written notice of readiness. *See United States v. Pierro*, 478 F.2d 386, 389 n.3 (2d Cir. 1973); *cf. United States v. Lane*, 561 F.2d 1075, 1076, 1077–78 (2d Cir. 1978).[6] In his opinion of June 23, 1976 denying defendants' motion for dismissal on speedy trial grounds, the trial judge specifically identified August 11, 1975 as the date of the government's announcement of readiness for trial, and the government's July 13, 1976 memorandum in opposition to the speedy trial motion makes the

---

**5.** Appellants argue that only part of this fourteen and one-half month period should be excludable, on the grounds (1) that the analogous provision of the Speedy Trial Act—18 U.S.C. § 3161(h)(1)(G)—was intended to permit exclusion only of time periods actually consumed by pretrial hearings, and (2) that such provision limits the permissible period of advisement to 30 days. Whether or not the drafters of the Act had such a narrow intention regarding the meaning of the term "proceeding," the language of Rule 5(a) of the Western District's Rule 50(b) Plan is clear that all periods during which motions are *sub judice* are excludable. Similarly, Rule 5(a) does not limit the period of time during which motions may be held under advisement. Moreover, appellants fail to indicate specifically what, if any, portions of this initial period from May 2, 1973 to July 15, 1974 were consumed by neither pending motions nor other pretrial proceedings. We, therefore, consider the entire period excludable.

**6.** Under the decisions of this Circuit, the government bears the burden of informing the trial judge of its state of readiness in pending cases. *United States v. Pierro,* 478 F.2d 386, 388 (2d Cir. 1973). This rule has been interpreted in some cases as requiring that the government file a notice of readiness for trial, *United States v. Rollins*, 475 F.2d 1108, 1111 (2d Cir. 1973); *United States v. Favoloro*, 493 F.2d 623, 624 (2d Cir. 1974); *United States v. Salzman*, 417 F.Supp. 1139, 1152–53 (E.D.N.Y.), *aff'd on other grounds*, 548 F.2d 395 (2d Cir. 1976), and in other cases as requiring only that the government announce its readiness orally in open court, *United States v. Masullo*, 489 F.2d 217, 224 (2d Cir. 1973); *United States v. Johnson*, 525 F.2d 999, 1007 (2d Cir. 1975). This issue was considered in some detail in *United States v. Pierro*, 478 F.2d at 388–89, where this court concluded that, consistent with the essential purpose of the notice requirement to inform the court, the government "must communicate its readiness for trial to the court in some fashion within the six month period . . . ." At the same time, the court emphasized that "the better practice" is to file a written notice of readiness with the clerk of the court for the judge's attention and to serve a copy on the defendant. *Id.*

same assumption.[7] The government further claims to have announced in open court on November 11, 1974 its readiness for trial. This claim, however, is unsupported by anything in the record, and Judge Curtin fails to mention it in either his initial consideration or his reconsideration of appellants' speedy trial motion.[8] We find the government chargeable with the period from November 1 through November 20, 1974 when the next excludable period begins, bringing the total non-excludable time from May 2, 1973 to November 20, 1974 to approximately four months and four days.

■ On November 20, defendants moved to inspect grand jury minutes and to dismiss the indictment for failure of the government to supply the grand jury with sufficient evidence that the films were transported in interstate commerce. Since the motions were *sub judice* until June 10, 1975 when the trial court issued a brief decision and order denying both motions, this entire period of over seven months must be excluded under Rule 5(a) of the Plan, although such extended consideration of the motions seems inordinately lengthy.[9]

From June 11 to July 7, 1975, so far as is discernible from the record, no action was taken by the government which would toll the readiness period. The delay from July 7 to July 21, 1975, however, must be attributed to defendants since they specifically requested an adjournment to file additional motions. Again, the record indicates no basis for exclusion of the period from July 22 to August 10, 1975, thus bringing to five months and twenty days the total non-excludable time from date of indictment and extending the expiration date of the six-month readiness period to August 20, 1975.

Consistent with the June 23, 1976 opinion of the trial court, we have accepted August 11, 1975 as the date "[t]he Government announced that it was ready for trial," although no written notice was filed. This announcement, made within the six-month notice period, may be deemed an adequate compliance by the government with its obligation under the Western District's Rule 50(b) Plans.[10]

## II. WESTERN DISTRICT'S NEW PLAN (SPEEDY TRIAL ACT OF 1974)

On January 3, 1975, the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161 *et seq.*, became effective. This Act set forth certain mandatory timetables and required the various district courts to adopt after study a plan formulated in accord with the Act, 18 U.S.C. §§ 3165–66, pursuant to which the Western District adopted an interim plan ("New Plan") effective from July 1, 1976 to July 1, 1979. Unlike the predecessor Rule 50(b) Plans, this New Plan, as required by the Speedy Trial Act, focuses not on the

---

7. In his August 4, 1976 opinion again denying appellants' speedy trial motion, Judge Curtin did not treat the government's motion to set a trial date as equivalent to a notice of readiness, stating that from date of indictment to June 1, 1976, "there was only about four and a half months of delay which could be arguably charged to the Government."

8. The government also claims to have satisfied the notice of readiness requirement by reporting this case to the trial court on a monthly basis beginning in November 1974 as awaiting a trial date. Aside from the government's own reference to such a practice in its Response to the Defendants' Motion to Dismiss, there is no support in the record suggesting that the government actually did report monthly or, if it did, that anyone received the reports. The trial judge makes no reference to such practice in either of his speedy trial opinions, and the docket sheet does not reflect that any monthly reports were made. Thus, we conclude that the record is insufficient to support the government's claim.

9. *See* note 5 *supra.*

10. While several of the decisions cited *supra* at note 6 support the sufficiency of an oral notice of readiness in open court, persuasive argument can be made that such a procedure should be impermissible where the normal practice has been to file a written notice as, indeed, was apparently the practice in the Western District at the time this action was instituted. This court noted in *United States v. Pierro*, 478 F.2d at 389 n.3, that "the commendable practice of filing a written notice of readiness is followed . . . by the United States Attorney's Offices for the Southern and Western Districts of New York." The failure of the United States Attorney to comply in this case with this procedure is unexplained.

obligation of the government to file a notice of readiness, but upon the obligation of the court to bring the case to trial within 180 days of the effective date of the Plan, subject to any periods of exclusion set forth in § 3161(h) of the Act. Specifically, Rule 7(a)(1) and Rule 5(a)(1) of the Western District's New Plan require that the government be ready for trial and that the trial commence within 180 days of July 1, 1976. In this case, the jury was not selected until October 12, 1977, 468 days after July 1, 1976, and trial did not actually commence until November 15, 1977, 502 days after July 1, 1976. Of this latter period, approximately 226 days were properly excludable.

■■ On July 1, 1976, appellants' motion to dismiss for lack of a speedy trial was pending and was not finally decided by the court until August 4, 1976. Delay occasioned by pendency *sub judice* of appellants' speedy trial motion is not chargeable against appellants because, as observed, in *United States v. Didier*, 542 F.2d 1182, 1188 (2d Cir. 1977), to do so would "improperly penalize defendants for their invocation of speedy trial rules and run counter to the purposes of those rules." However, on August 10, appellants appealed the trial court's denial of their speedy trial motion, which appeal, according to the docket entry on September 24, 1976, was dismissed upon the government's motion for lack of finality. It would seem to us that this period must be excluded because it would otherwise "improperly penalize" the government for the ill-advised action of appellants. On December 3, appellants requested an adjournment beginning on December 6 and continuing through January 18, 1977, and, therefore, that 44-day period is also excludable. Thus, of the 202 days from July 1, 1976 through January 18, 1977, 112 days are not excludable.

■ From January 19 to April 4, 1977, according to the docket sheet, no action was taken by the court or either party justifying exclusion of the period from the mandatory timetable. However, the government asserts in its brief that after December 6, 1976 there was "a whole series of adjournments at the request of the defendants." [11] This conclusory statement is not supported by any indication in the record as to what, if any, periods are properly excludable. Although a docket entry on January 13, 1977 indicates that a meeting was held and that the trial was then adjourned from January 25 to February 15, 1977, no reasons are stated for the postponement and the record does not reflect that appellants agreed to any waiver of their rights. Nor, in the absence of findings by the court, can the exception of § 3161(h)(8)(A) be invoked to serve the "ends of justice." Judge Mansfield charges appellants' trial counsel with obvious efforts to postpone an imminent trial by resorting to plea negotiations from January through July 1977 and asserts that the trial court "permitted itself to be lulled by the defendants' extraordinarily successful delaying tactics." We have difficulty in believing that the able and experienced trial judge would permit himself to be lulled or that the defense counsel's conduct can fairly bear the weight of this charge. While it could be argued that time consumed in plea negotiations should be excludable since initiated by defendants, an equally appealing argument can be made that such negotiations are potentially as beneficial to the government as to the defendants. In all events, both the government and the court have an obligation to insure that such negotiations do not interfere with speedy trial requirements of the Western District's New Plan. In fact, under Rule 5(f)(1) of the New Plan the court has "the sole responsibility for setting cases for trial . . . ." At minimum, if such periods are to be excluded, it seems to us that the burden is on the government or the court to set forth in the record what are excludable periods or at least what are the operable facts leading to the exclusion. To hold otherwise, as the dissent suggests, by inferring intentional delay by appellants wherever the reason for a delay is unrecorded, would effectively emasculate the

---

11. Appellee's Brief, p. 29.

Speedy Trial Act and would transfer to a defendant responsibility which has properly been assigned to the court and the government. Recording is essential to effective implementation of the Act and, indeed, is mandated by Rule 10(b) of the New Plan, requiring the docketing of all "information with respect to excludable periods of time . . . ." In the context of this background, we believe that the 76 days from January 18 to April 4, 1977 are not excludable, although, as appears *infra*, the exclusion of this period would not preclude a violation.

■■■■■ The period from April 5 to April 12, 1977 is excludable due to defense counsel's request for an adjournment necessitated by his schedule. In an order dated April 12, Judge Curtin sought to exclude also the period from April 13 to June 27, 1977 as "in the public interest" because of his commitment to the trial of other cases in April, May and early June. Under § 3161(h)(8)(C), however, the court's discretion to grant continuances upon a finding that "the ends of justice" are served thereby is explicitly qualified by the limitation that "[n]o continuance . . . shall be granted because of general congestion of the court's calendar . . . ." *See United States v. Didier*, 542 F.2d at 1188; *United States v. Carini*, 562 F.2d 144, 149 (2d Cir. 1977); *United States v. Roberts*, 515 F.2d 642, 644 (2d Cir. 1975). Therefore, this 75-day period cannot be excluded.

■■■■■ The jury was finally empanelled on October 12, 1977. The following periods immediately preceding that date are excludable because of (i) an adjournment from June 27 to July 13, due to illness of defense counsel's wife; (ii) the finding of

the court that the delay from July 13 to September 1 is "in the interest of the defendant and the public"; [12] and (iii) an adjournment from September 15 to October 12, due again to illness of defense counsel's wife. The period from September 2 through September 14 is not excludable, however, because the delay was purely for the convenience of the court. Although appellants contend that the 33 days from October 13 to November 15, 1977, when the actual trial commenced, are not excludable, Rule 5(e)(2) of the Western District's New Plan specifically provides that "[a] trial in a jury case shall be deemed to commence at the beginning of voir dire." Because voir dire occurred on October 12, we conclude that the period thereafter until November 15 is excludable. Thus, the non-excludable delay between July 1, 1976 and the date of trial totals 276 days.

■■■■■ After subtracting the periods of excludable delay in accordance with the above computation, the 180-day limit imposed by the Speedy Trial Act was exceeded in this case by approximately 96 days. Even excluding the additional period of 77 days from January 19 to April 4, 1977 during which appellants' trial counsel sought to negotiate a plea agreement, the 180-day limit was exceeded by 19 days. As the government suggests in its brief, however, dismissal of the indictment as a sanction for violation of the timetable effective until July 1, 1979 is not mandated under the Act. 18 U.S.C. §§ 3162, 3163(c).[13] Moreover, this court has previously held that until that date "the violation of the Speedy Trial Act is not, in and of itself, a sufficient reason for dismissing the [indictment] here." *United States v. Carini*, 562 F.2d at 148. Such a violation may, however, be con-

---

**12.** The trial judge states that this period is excludable under 18 U.S.C. § 3161(h)(8)(A), which subsection gives the court authority to grant continuances upon a finding that the "ends of justice" will be served thereby. He did not, however, comply with the further provision of that subsection, which states that "[n]o such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in

the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial."

**13.** While no dismissal sanction is provided for violation of this Plan, appellants could but did not apply to the court's discretion under Rule 48(b) of the Federal Rules of Criminal Procedure for a dismissal.

sidered as a factor to be weighed together with other circumstances in a court's analysis of a claimed violation of a defendant's constitutional right to a speedy trial, and, in fact, such a finding may "tip the scales" in defendant's favor where the balance is close. *Id.* at 151–52. We proceed, accordingly, to the issues raised by appellants' constitutional claim.

## III.  SIXTH AMENDMENT

■ Appellants contend finally that the 54-month delay between indictment and date of trial violated their rights under the Sixth Amendment to a speedy trial. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Both the court and the government in this case had an affirmative obligation to appellants and to the public generally to bring this matter on for trial promptly, rather than permitting delay—for whatever reason—to drag on for over four and one-half years. *United States v. Vispi,* 545 F.2d 328, 334 (2d Cir. 1976). Further, where the delay is as substantial as it was in this case, the burden is upon the government to prove that the delay was justified and that appellants' speedy trial rights were not violated. *United States v. Jones,* 173 U.S.App.D.C. 280, 524 F.2d 834, 849 (1975); *United States v. West,* 164 U.S.App.D.C. 184, 187–88, 504 F.2d 253, 256–57 (1974); *United States v. Salzman,* 417 F.Supp. 1139, 1165 (E.D.N.Y.), *aff'd on other grounds,* 548 F.2d 395 (2d Cir. 1976); *compare* 18 U.S.C. § 3162(a)(2). Although this is a close case due to some delay occasioned by the conduct of appellants' trial counsel, we conclude upon the totality of the circumstances that the government has failed to satisfy its obligation.

■ *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), is of course the controlling authority. There, the Supreme Court clearly enunciated the essential factors to be considered in determining a denial of the Sixth Amendment right to a speedy trial as follows: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right;

and (4) the prejudice to defendant resulting from the delay. *Id.* at 531–33, 92 S.Ct. at 2192–93; *see also United States v. Vispi,* 545 F.2d at 333; *United States v. Roberts,* 515 F.2d at 645. Though each of these factors is important, other circumstances may be relevant as well. *Barker v. Wingo,* 407 U.S. at 533, 92 S.Ct. at 2193. At the same time, the Court made it clear that the constitutional right to a speedy trial cannot "be quantified into a specified number of days or months." *Id.* at 522, 92 S.Ct. at 2188. Instead, the approach should be "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 531, 92 S.Ct. at 2192.

The length of the delay in this case—four and one-half years—is unquestionably substantial, and while it may not be conclusive of the constitutional issue, it must weigh heavily in support of appellants' claim that their rights have been violated. Such delay here is clearly enough to "trigger" the constitutional analysis with respect to the other elements of the *Barker* test. *Id.*

■ The reasons for the delay were varied, as the foregoing analysis indicates, but we believe that the bulk of the delay—approximately 31 months—was chargeable to the government's inaction, the overcrowded dockets of the Western District of New York, and the trial court's failure to rule expeditiously on appellants' motions. While the government may have had little control over the "institutional delays" more appropriately attributable to the court, "the ultimate responsibility for such circumstances must rest with the government rather than the defendant." *Id.* at 531, 92 S.Ct. at 2193. This court has previously held that:

> [r]egardless of the judge's inaction or the fact that the delay may have been in part attributable to institutional factors, the government was not entitled to sit back and rely upon its pro forma notice of readiness; it owed the additional duty of monitoring the case and pressing the court for a reasonably prompt trial. We have repeatedly emphasized that affirmative action by the government in bringing

cases to trial is mandated and that it cannot escape this duty on the ground that the delay is for institutional reasons. *United States v. Vispi*, 545 F.2d at 334. Though a number of adjournments were attributable to requests by appellants, their duration was minimal in comparison to the lengthy and repeated periods of court and government inaction. Moreover, unlike a complex antitrust or fraud action, the nature of this case is not such as would necessitate the 54 months of delay in preparation for trial, and it is notable that the actual trial, once begun, was completed in no more than four days. *Barker v. Wingo*, 407 U.S. at 531–32, 92 S.Ct. at 2192. Finally, appellants assert—and the record indicates—that plea negotiations were ongoing for at least a year prior to the date of their speedy trial motion. Good faith plea negotiations by a defendant should not be equated to a waiver of speedy trial rights, and, under the circumstances, the government must assume responsibility for the risk of institutional delays where the bargain ultimately is unsuccessful. *Compare United States v. Roberts*, 515 F.2d at 647; *United States v. Carini*, 562 F.2d at 149. We find no basis in the record to support Judge Mansfield's statement that the inference is "inescapable" that appellants engaged in plea negotiations merely as "a delaying maneuver."

▪ It is true that the appellants did not move for dismissal, based upon speedy trial grounds, until June 1, 1976—approximately 40 months after the date of indictment—and that this is a consideration which must be weighed in determining a violation of their Sixth Amendment rights. Prior to that time they had been engaged in plea negotiations with the government to avoid the necessity of trial, and it is not unreasonable to assume that they were

"lulled into not pressing for trial" during that period. *United States v. Carini*, 562 F.2d at 149. More important, however, is the fact that after the June 1, 1976 speedy trial motion was made, there was a 16-month delay prior to the commencement of the trial. In *Carini* this court held that such post-assertion delay was of "especial importance" in that the government and court were then put on notice that they "would be held strictly accountable for the passage of time *after* the motion to dismiss for want of a speedy trial had been made." *Id.* at 150. Though defendants requested several adjournments due to illness of defense counsel's wife and in order to permit defense counsel in early April 1977 to try another case, such continuances would not have been necessary had the government fulfilled its obligation to press for trial before that time.[14] A rigid application of the demand-waiver rule was rejected in *Barker*. There, the Supreme Court reiterated the rule that there is no duty upon a defendant to bring himself to trial, but that the duty is upon the state, in the interest of the public, to bring prosecutions to a swift conclusion.[15] We do not read *Barker* as indicating that the duty of the state to bring a defendant to trial is postponed or minimized by a defendant's continuing, although unsuccessful, efforts to obtain a favorable plea. We conclude that under such circumstances appellants' delay in making a prior demand for a speedy trial is not sufficient to vitiate a violation of their Sixth Amendment rights.

▪ The fourth factor under the *Barker* test—prejudice to appellants—is evident in this case in two respects. First, the extended delay would unavoidably increase the "anxiety and concern" suffered by appel-

---

14. The government in its brief cites a letter, dated September 14, 1977, from Assistant United States Attorney Williams to the court attributing the adjournment of fifteen scheduled trial dates since June 1, 1976 solely to appellants. In the absence of corroboration in the record as required by Rule 10(b) of the New Plan, this assertion must be viewed as a self-serving declaration by the government.

15. The Court, in *Barker v. Wingo*, 407 U.S. 514, 528, 92 S.Ct. 2182, 2190 (1972), stated:

A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process. Moreover, . . . society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest.

lant Levene as a result of the pending criminal indictment. *Barker v. Wingo*, 407 U.S. at 533, 92 S.Ct. at 2193. While not unique to appellant Levene, this kind of prejudice becomes especially significant where prolonged for a period of four and one-half years after date of indictment. Second, and more important, is the possible impairment of appellants' ability to present a defense which may have been caused by the delay. As stated in *Barker, id:*

> Of these [interests], the most serious is the last, because the inability of a defendant adequately to prepare his case skews to fairness of the entire system. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

Appellant Levene's uncontradicted affidavit, sworn to in June 1976, describes the difficulties caused by the delay in preparing for trial. The art director and the story editor of "Belinda" could no longer be located, and certain actors and actresses, who previously had agreed to testify, refused to attend trial for fear that they might also be subject to criminal prosecution if a verdict unfavorable to defendants was returned by the jury.[16] Also submitted at that time was a letter written by Charles Winick, Professor of Sociology at the City College of New York, in which he evaluates changes be-

tween 1972 and 1976 in public attitudes toward sexually explicit films and concludes that those attitudes had changed in a way detrimental to appellants—specifically, that "attitudes in 1972–73 were far more accepting and liberal than they have been during the last year [1975–76]." The government offered no other experts in this field to dispute his opinion, and in view of his experience and qualifications his opinion can hardly be dismissed as frivolous.[17] Where, as here, a case turns on a morals point of view, it is important that the trial be framed in terms of the community standards existing at the time of the alleged offense, which in this case was 1973. Consequently, it is impossible to say that the moral standards prevailing at the time of the trial over four years later were the same as those existing on the date of indictment. Hence, there was all the more reason for a speedy trial. The government relies on the fact that appellant Levene has been free on bail since 1973 and has failed to demonstrate any adverse effect on his income or reputation as a result of this protracted prosecution. As *Barker* indicates, however, prejudice takes various forms, and based upon the above analysis, we find that the fourth factor of the *Barker* test is appropriately weighed in appellants' favor.[18]

Finally, the violation of appellants' rights under the Western District's New Plan—occurring in its entirety after appellants'

---

**16.** In appellant Levene's affidavit, it appears that during the pendency of this action an actor was convicted of conspiracy by a federal court in Memphis, Tennessee based on his participation in an allegedly obscene motion picture. Appellants claim that this widely publicized conviction chilled the willingness of several actors and actresses involved in the film here in issue to attend trial, and, as a result, they retracted their agreement to testify on appellants' behalf.

**17.** According to Professor Winick, his evaluation of public attitudes is "based on many years of investigation," involving studies conducted for the President's Commission on Marijuana and Drug Abuse and for the Commission on Obscenity and Pornography and service as contributing editor for sex research of Medical Opinion and Review and as co-editor of the Annual Review of Studies in Deviance. A

number of his studies have appeared in journals such as *Films and Filming, Psychiatry*, and *American Sociological Review*, and he has been the recipient of federal grants over a period of twenty years.

**18.** We are not here passing upon the alleged obscenity of the film, but upon the right of appellants to a speedy trial. Consequently, we believe that the 1973 F.B.I. Report annexed to the dissent as an appendix is irrelevant. If it is annexed to show that there could have been no prejudice from delay because a jury using 1973 standards would have to hold exactly the same way as the jury did hold sitting in 1977, we think that this presupposes too much; juries' verdicts simply cannot be guessed, especially in criminal cases involving the presumption of innocence.

speedy trial motion—is a factor which supports our conclusion that appellants' Sixth Amendment rights have been violated. We cannot subscribe to Judge Mansfield's statement that a Speedy Trial violation is "largely irrelevant" since it has been established in this Circuit that a "violation of the Speedy Trial Act is a proper factor to be weighed in our analysis of whether [a defendant] was denied his constitutional right to a speedy trial." *United States v. Carini*, 562 F.2d at 148. The government cites *United States v. Lane, supra*, as authority in support of its contention that appellants' speedy trial claims should be denied. As stated in *Barker*, every case must be approached on an *ad hoc* basis. 407 U.S. at 503, 92 S.Ct. at 2192. We believe that the facts in *Lane* differ significantly from the facts in the present case. Notable among other circumstances are the absence in *Lane* of a violation of the District Court Speedy Trial Act Plan, the failure of defendant to demonstrate any prejudice resulting from the delay, and the absence of continuing plea negotiations which mitigate the importance of the defendant's delay in asserting his speedy trial right.

After considering all the facts in this case, we believe that, on balance, appellants' Sixth Amendment rights to a speedy trial have been violated. Accordingly, the judgments of conviction are reversed with instructions to dismiss the indictment.

## APPENDIX

| Date | Days | | Category | Reason |
|------|------|------|----------|--------|
| [Western District's Rule 50(b) Plan effective 4/1/73; superseded by Interim Rule 50(b) Plan on 9/29/75] | | | | |
| 5/2/73 —7/15/74 | 439 | | excludable | motions |
| 7/16/74 —11/19/74 | | 127 | non-excludable | |
| 11/20/74—6/10/75 | 203 | | excludable | motions |
| 6/11/75 —7/6/75 | | 26 | non-excludable | |
| 7/7/75 —7/21/75 | 15 | | excludable | defense request |
| 7/22/75 —8/10/75 | | 20 | non-excludable | |
| 8/11/75 —Government notice of readiness for trial | | | | |
| [Western District's New Plan (Speedy Trial Act of 1974) effective 7/1/76 through 7/1/79] | | | | |
| 7/1/76 —8/4/76 | | 35 | non-excludable | |
| 8/5/76 —8/9/76 | | 5 | non-excludable | |
| 8/10/76 —9/24/76 | 46 | | excludable | interlocutory appeal |
| 9/25/76 —12/5/76 | | 72 | non-excludable | |
| 12/6/76 —1/18/77 | 44 | | excludable | defense request |
| 1/19/77 —4/4/77 | | 76 | non-excludable | |
| 4/5/77 —4/12/77 | 8 | | excludable | defense request |
| 4/13/77 —6/26/77 | | 75 | non-excludable | |
| 6/27/77 —9/1/77 | 368 | | excludable | defense request; § 3161(h)(8)(A) |
| 9/2/77 —9/14/77 | | 13 | non-excludable | |
| 9/15/77 —10/12/77 | 28 | | excludable | defense request |
| 10/13/77—11/14/77 | 33 | | excludable | post-voir dire |
| 11/15/77—Commencement of trial | | | | |
| TOTALS (under New Plan) | 227 | | excludable | |
| | | 276 | non-excludable | |

OAKES, Circuit Judge (concurring specially):

I join in Judge Bartels' opinion in respect to the deprivation of a speedy trial. Although, if this were the only issue in the case, I might as the better part of appellate discretion be agreeable to remand for further findings regarding reasons for delay and resulting prejudice, Judge Bartels does point out that "the burden is on the government or the court to set forth in the record" excludable periods or "at least . . . the operable facts leading to the exclusion." In any event, at this stage of an already drawn-out proceeding, a remand would be inappropriate.

Moreover, it seems to me that on independent, albeit interrelated, grounds the judgment of conviction cannot stand. The indictment charged transportation of an obscene film "in interstate commerce, by means of common carriers . . . from the State of New Jersey to the City of Buffalo . . . ." But the Government proved only a shipment from *New York, New York,* to Buffalo and sought to prove its interstate character by virtue of a Greyhound Lines, Inc., terminal manager's testimony, made in reliance on Greyhound's Timetable No. 70 (GX 10), that at the time in question "our service between New York, New York, and Buffalo, New York, operated through the State of New Jersey . . . [and specifically] the Town of Paramus, New Jersey."[1] This was a variance going to a vital element of the crime under 18 U.S.C. § 1462. A material variance may in and of itself be grounds for reversal, at least if it so modifies the elements of the crime that it creates a *different* crime, see *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *Ex parte Bain,* 121 U.S. 1, 8, 7 S.Ct. 781, 30 L.Ed. 849 (1887). True, we have said that a material variance occurs only if it "prejudiced the ability of the defendants to make their defense to the charge . . . ." *United States v. Knuckles,* 581 F.2d 305, 311–12 (2d Cir. 1978); *United States v. Somers,* 496 F.2d 723, 744 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). But what is involved, of course, is the right to be informed of the charges against one. *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Here the charge was that the film was shipped from the state of New Jersey to the city of Buffalo. Appellants were prejudiced by the variance in proof because they might well have disputed more vigorously than they were able, note 1 *supra,* that they transported the film through Paramus, New Jersey.

True, the Government argues that there could have been no surprise because (a) appellants were aware that "as far as [appellant Levene] knew all of his films since the inception of Aquarius Releasing, Inc. were stored in the New York City Warehouse" (Gov't Br. 13) and (b) through pretrial discovery appellants learned of Gov't Ex. 9, the Greyhound Lines bus bill showing that the film went from the New York City

---

1. On cross-examination counsel for appellants did elicit that the witness could not tell what bus carried the film or whether it was detoured on that day, and the witness conceded that "we will alter our routes because of traffic conditions. . . ." Counsel did not inquire, however, as to Bus No. 3300, the 9:45 westbound, which appears to be express to Rochester, then to Buffalo. Greyhound Timetable No. 70, Table 255, effective Jan. 3, 1973. Nor did he explore the use of the January, 1973, edition of Russell's Official National Motor Coach Guide which, appellants advise us, indicates several other Greyhound schedules (Nos. 16, 390, 720, 255, 260) showing routes that do *not* run

through Paramus, New Jersey. I note these omissions only as they may bear on prejudice to appellant from the variance between the charge in the indictment and the proof.

The Government suggests that the issue of variance was not timely raised. But at the close of the Government's case and of the defense case and upon the return of verdict appellants moved for dismissal on grounds of insufficiency of the evidence, and in particular failure to prove that the shipment was made in interstate commerce. It appears that the defendant in *Stirone v. United States,* 361 U.S. 212, 214, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), did not raise the variance issue any more directly.

terminal to the Buffalo, New York, terminal. But armed with this information, appellants were fully prepared to meet the charge of the indictment, that the film had been transported "from the State of New Jersey to the City of Buffalo." This preparation, however, could hardly have enabled them to meet an amended charge that the film was transported from New York, New York, to the city of Buffalo by way of Paramus, New Jersey. By hindsight one can think of several courses, *see* note 1 *supra,* counsel might have pursued to meet such an amended charge; that he did not do so when first confronted by the Greyhound witness's testimony is to my mind indicative of surprise and prejudice.

I note that we have previously distinguished *Stirone* on the basis that the indictment in that case alleged "interference by extortion with the *importation* into Pennsylvania of sand to be used in building a new plant" while the proof showed "interference with the *exportation* from Pennsylvania of steel to be manufactured in the new plant." *United States v. Colasurdo,* 453 F.2d 585, 591 (2d Cir. 1971) (emphasis in original), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972); *see also United States v. Knuckles, supra,* 581 F.2d at 312. But such a distinction cannot be made here, where the charge was shipment *from* New Jersey and the proof was (somewhat thinly at best) shipment *through* New Jersey.[2] Thus I think *Stirone* controlling.

Even if I am wrong about the variance issue, however, there was no proof that appellants Levene and Aquarius Releasing, Inc.,[3] *knowingly*[4] used interstate commerce for the shipment from New York to Buffalo. The Government contends that the interstate commerce requirement of 18 U.S.C. § 1462 is jurisdictional, citing *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43

---

**2.** Judge Leventhal has distinguished *Stirone* by saying that "[i]n *Stirone* the prosecution was relying at trial on a complex of facts distinctly different from that which the grand jury set forth in the indictment . . . In the case before us, there is a single set of facts . . ." *Jackson v. United States,* 123 U.S.App.D.C. 276, 279, 359 F.2d 260, 263, *cert. denied,* 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966). *See also United States v. Garguilo,* 554 F.2d 59, 63 n.2 (2d Cir. 1977). Here, it would seem, as in *Stirone,* there is a different "complex of facts" involved, relating to the use of a common carrier, for carriage in interstate commerce, of an obscene film.

My colleague Judge Mansfield believes that *United States v. Knuckles,* 581 F.2d 305 (2d Cir. 1978), dictates a contrary result. But *Knuckles* emphasized that a variance as to the narcotics substance is immaterial when "the time, place, people, and object proved at trial are in all respects those alleged in . . . the indictment." *Id.* at 311. Here, by contrast, there is a substantial variance as to "place," that, as in *Stirone,* goes to jurisdiction of the federal courts. I do not think that we can presume that a grand jury would have indicted for a shipment that, at most, merely passed through New Jersey.

**3.** Assuming that the film was obscene, appellant New Buffalo's conviction would stand, in my view, if the speedy trial and variance issues were determined against it.

**4.** 18 U.S.C. § 1462 reads in pertinent part:

Whoever . . . knowingly uses any . . . common carrier, for carriage in interstate or foreign commerce—

(a) any obscene . . . motion-picture film, . . .

Shall be fined . . . or imprisoned . . .

It is not enough, contrary to the trial court's charge, that knowledge of use of a common carrier be shown; the statute requires knowing use of such a carrier "for carriage in interstate or foreign commerce." In *Gold v. United States,* 378 F.2d 588 (9th Cir. 1967); *United States v. Kelly,* 398 F.Supp. 1374 (E.D.Mo. 1975), *rev'd on other grounds,* 529 F.2d 1365 (8th Cir. 1976); and *United States v. Rubin,* 312 F.Supp. 950 (C.D.Cal.1970), cases relied upon by the Government, the sole question was whether there was "use" of a common carrier or whether the defendant was aware of the contents or character of the shipment, not whether the defendant knew that the shipments were in interstate commerce (it was undisputed that the shipments were interstate). *Hamling v. United States,* 418 U.S. 87, 119–24, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), involved 18 U.S.C. § 1461, which proscribes knowing use of the mails for unmailable matter, a statute with a different thrust from the one at bar; the knowledge required under § 1461 relates to the nature, content, and character of the film, and to the knowing use of the mails, not to the

L.Ed.2d 541 (1975), where the court noted that "the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute," *id.* at 676 n.9, 95 S.Ct. at 1260, and thus upheld a conviction for assault even though the defendant did not know that his victim was a federal officer.[5] But in *Feola* the statutory language did not require such knowledge; indeed the defendant conceded that scienter was not a necessary element of the offense. *Id.* at 677, 95 S.Ct. 1255. And the Court was very careful to hold only that the statute in issue (18 U.S.C. § 111) did not embody "an *unexpressed* requirement that an assailant be aware that his victim is a federal officer" (emphasis added). *Id.* at 684, 95 S.Ct. at 1264.[6] Although to some it might appear overly technical to construe a statute to require proof of knowing carriage in interstate commerce, when, as the Government argues, "federal [criminal] jurisdiction has broadened in areas requiring a nexus to interstate commerce," we must remember that 18 U.S.C. § 1462 is a criminal prohibition against conduct that has potential First Amendment protection. Congress has specifically imposed a requirement of "knowingly," note 4 *supra*. Concededly there was no proof that Aquarius or Levene knew that the shipment from New York City to Buffalo traveled in interstate commerce. Although it may be argued that appellants were aware of certain contracts with Bonded Film Distributors under which various films *would* be distributed across the country and even to other countries, I do not see how a jury could infer from this, or from any supposed knowledge of use of a

common carrier, that a shipment between two points in one state would pass *through* another state, especially when it is not at all obvious from a road map that there is any more direct route from New York City to Buffalo than the New York State Throughway (U.S. Interstate Highway 87), which does not cross any state line.

Thus I would reverse the judgment on these two grounds as well, although they are unnecessary to reach if Judge Bartels and I are correct on the speedy trial issue.

MANSFIELD, Circuit Judge (dissenting):

I dissent. The record indicates that the delay in bringing the defendants to trial was attributable largely to the dilatory tactics of their attorney in postponing trial, despite the Government's readiness and the trial judge's repeated efforts to get the case to trial. There was no timely assertion by defendants of their right to a speedy trial. No legally cognizable prejudice to the defendants has been shown. Thus the standards of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), have clearly not been met in this case.

The court's decision works a serious injustice, rewarding the defendants for their attorney's successful stalling maneuvers. Moreover, the majority has engaged in unjustifiable appellate fact-finding, based largely on assumptions rather than on evidence. In my view, at the very least the majority, before reversing on the basis of disputed facts and an incomplete record, should remand the case to the district court for findings regarding the reasons for the

---

use of a common carrier "for carriage in interstate . . . commerce." Other cases that the Government cites involve statutes with language different from 18 U.S.C. § 1462.

**5.** We applied *Feola* in *United States v. Viruet*, 539 F.2d 295, 297 (2d Cir. 1976) (per curiam) (unnecessary under 18 U.S.C. § 659 to prove knowledge that hijacked truck would be moving in interstate commerce), and in *United States v. Green*, 523 F.2d 229, 233–34 (2d Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976) (same). Both cases, how-

ever, involve a statute that does not explicitly require knowledge of the interstate movement of the stolen goods and hence a statute different from the one in issue here.

**6.** The court was also very careful to point out that merely calling a statutory requirement "jurisdictional" does not end the inquiry; a further question is whether it is "jurisdictional only," or instead an element of the offense. 420 U.S. at 676 n.9, 95 S.Ct. at 1255.

delay and the resulting prejudice, if any, to the defendants.

The majority lists at considerable length its concept of how many days during the long period from the filing of the indictment until trial should be labeled as "excludable" and "non-excludable" under the Western District's Rule 50(b) Plan and its Speedy Trial Act Plan which went into effect July 1, 1976. In my view this procedure serves no useful purpose and is misleading, since as the majority concedes there was no violation of the former Plan and the Speedy Trial Act prohibits dismissal for any pre-July 1, 1979, violation of the latter Plan. See *United States v. Carini*, 562 F.2d 144, 148 (2d Cir. 1977).

In enacting the Speedy Trial Act Congress recognized that a four-year phase-in period would be required before the sanction of dismissal for non-compliance might be imposed, see 18 U.S.C. § 3163(c), since it would take many district courts that much time to eliminate their criminal case backlogs and to obtain the additional personnel, facilities, and new systems needed to meet the permanent time limits which would go into effect July 1, 1979. Viewed realistically, the interim time limits have represented hopes rather than firm mandates. Cf. *United States v. Amendola*, 558 F.2d 1043, 1045 (2d Cir. 1977) ("minimal" violation of Connecticut Speedy Trial Plan does not warrant dismissal).

In my view, the excludability or non-excludability of time under the terms of these prior Plans is largely irrelevant since their standards differ substantially from the four-factor test established by *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), for determining whether a defendant's Sixth Amendment right to a speedy trial, as distinguished from statutory rights, has been violated. When the *Barker v. Wingo* standards are applied, it is clear beyond peradventure that the defendants' constitutional right to a speedy trial

was not violated. Although the time from indictment to trial was long, the record repeatedly demonstrates that if the defendants had really wanted an earlier trial they could have had one at least as early as June 1, 1976, when Chief Judge Curtin (to whom the case was assigned for all purposes) ordered that a jury be drawn, and probably earlier. The Government was ready for trial at least as early as August 11, 1975. Indeed, by written notice dated November 1, 1974 (App. 36) the Government advised defense counsel that the case would be called on November 11, 1974 in Part I of the U.S. Courthouse in Buffalo for the purpose of "SETTING TRIAL DATE." The docket shows that this hearing was adjourned to November 20, 1974, for a meeting with Judge Curtin but there is no record of what transpired at that meeting.

What were the reasons for the repeated adjournment of the trial date? The Appendix and docketed record, while obviously quite incomplete, furnish sufficient information to support a strong inference that defense counsel, rather than the Government or the court, was mainly responsible for the delay. Defendants never sought a trial; on the contrary, they repeatedly sought to avoid trial.

Following the filing of the indictment on May 2, 1973, Judge Curtin granted the *defendants'* motion to defer all proceedings until the end of June, 1973, when certain cases pending before the United States Supreme Court, which could have affected the prosecution of the present case, would have been decided.[1] In the latter part of 1973 the defendants then filed numerous pretrial motions, including motions to dismiss the indictment in a related case (Cr. 1973–118), supported by affidavits and briefs necessitating answering affidavits and briefs from the Government and oral argument on February 14, 1974, which culminated in the court's denial of the motions on July 15,

---

1. See *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), decided on June 21, 1973. Other obscenity cases decided by the Supreme Court that same day were *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628,

37 L.Ed.2d 446 (1973); *Kaplan v. California*, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973), and *United States v. 12 200-Foot Reels of Super 8 mm. Film*, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973).

1974. There followed the Government's effort in November, 1974, to get a trial date fixed. Additional motions apparently were filed in related cases, including motions to dismiss, which were denied by the court on June 10, 1975.

Immediately upon denial of the latter motions defense counsel Seymour S. Detsky, whose offices were in New York City, by letter dated June 20, 1975 (App. 34) to Assistant U.S. Attorney Williams in Buffalo, initiated plea bargaining negotiations. However, when the U.S. Attorney by letter dated July 2, 1975 (App. 33) advised Detsky he was willing to discuss the matter, Detsky by letter dated July 15, 1975 (App. 32) sought delay because of his own engagement in a trial. The U.S. Attorney by letter dated July 28, 1975 (App. 35) offered to accept a guilty plea from defendants Loew's Theatres, Inc., Arena and Levene to any one count of the indictment, adding "If I do not hear from you by August 11, 1975, I will move this matter for immediate trial." As a result, on August 11, 1975, according to the docket sheet, Judge Curtin directed "that [the] case be placed on the trial calendar."

Faced with trial, Detsky, according to his letters dated September 9, 1975 (App. 31) and September 26, 1975 (App. 30), reopened plea negotiations by having his client write a letter to Assistant U.S. Attorney Williams (App. 57), and by making an appointment to go to Buffalo to see Williams about the matter. However, Detsky's September 9th letter concedes that he then "telephoned [Williams'] office to cancel that appointment because I was then engaged in a continued trial which extended beyond the dates I had speculated." In a letter dated September 30, 1975, Williams replied he was willing to meet on October 2, October 10, or any time the following week (except October 13) but that "as previously indicated" he was "not of a mind to accept a corporate plea." (App. 29).

The record does not reveal what happened as a result of the foregoing correspondence except that almost five months later Detsky, by letter of February 10, 1976 (App. 28), again sought an opportunity to discuss a plea that would dispose of the case. Once again, this time on February 24, 1976 (App. 26, 27), Williams replied that his position had not changed, that he was "not of a mind to accept a corporate plea from Aquarius Releasing, Inc.," but that he would be happy to meet with Detsky.

Thus the picture during the period prior to June, 1976, is one of defendants who were not seeking or asking for a trial but, on the contrary, were trying to induce the Government to accept a plea only by the corporate defendants and, when the Government twice refused any such bargain, were asking to reopen plea negotiations, thus implying that some other disposition might be negotiated.

In short, the defendants' objective was to avoid or delay trial by negotiating a corporate guilty plea. This was confirmed when, after defendants' stalling tactics failed, Judge Curtin met with counsel on June 1, 1976, to begin selection of the jury in the case (App. 38). Thereupon

> "Mr. Detsky moved for dismissal on the ground that the Government had not afforded his clients a speedy trial. Furthermore, he contended that he did not represent defendant Benjamin Abrams although the court records indicated the contrary. Later he reported to the court that he did represent Abrams but Abrams had left the country. The Government's affidavit represents that the FBI investigation reveals that Mr. Abrams still lives in the Buffalo, New York area. It appears that the Government has been ready at all times necessary in this case . . . . Putting aside the fact that the court since the summer of 1975 has been trying criminal cases, *at no time during that period did defense urge a motion similar to the present one. That motion was not filed until the date set for jury selection.*" (App. 38–39, Mem. Opin. of Judge Curtin, 6/23/76) (emphasis supplied).

Judge Curtin, in his decision dated June 23, 1976, promptly denied the motion to dismiss, directing that if defendant Abrams

was not represented by Detsky he should retain counsel and be ready for trial on July 20, 1976.

Instead of availing himself of the opportunity to have the defendants go to trial immediately, Mr. Detsky moved the court to reconsider its decision, contending in a June 28 letter to Judge Curtin that defendants had not moved to dismiss earlier on speedy trial grounds because they had been trying "to work out a plea for the corporations and dismissing as to the individuals" and adding "I assumed that I would receive word on the aforesaid proposals. Instead I received a statement indicating readiness for trial. I state this so that the Court would not believe that we sat idly by abiding our time hoping that the United States would forget we existed." (App. 40).

The truth, of course, was that the U.S. Attorney had long since repeatedly stated in writing to Detsky that he would not agree to any such proposals, despite which Detsky had thereafter reopened negotiations. Not surprisingly, the court on August 4, 1976, denied defendants' motion for reconsideration and set jury selection for August 10, 1976.

If there were any doubt about the defendants' consistent purpose from the inception of the case of delaying trial, it was removed by their next move. On August 10, 1976, *the day set for selection of the jury,* defendants filed a notice of appeal from Judge Curtin's interlocutory, nonappealable order denying their motion to dismiss the case for lack of a speedy trial. This patently frivolous move served the purpose of preventing the case from going to trial that day as scheduled.

As anyone with even the slightest knowledge of federal practice could have predicted, the appeal was dismissed by us on September 14, 1976, for lack of jurisdiction. It may reasonably be inferred from this record that the appeal was taken in bad faith as a maneuver designed to block a prompt trial, which it succeeded in doing. The docket shows that the pertinent papers were not returned by our court to the Western District of New York until September 29, 1976.

Thereupon, it became necessary to appoint counsel for defendant Abrams, whom Detsky again disclaimed as his client after having claimed Abrams as his client on other occasions and having appeared as his counsel of record. This "on-again, off-again" representation of Abrams afforded another defense mechanism for delay of trial.

Of course, a busy district court such as the Western District with only three judges can hardly be expected to drop everything upon remand of a criminal case by the Court of Appeals and bring that case immediately to trial. However, Judge Curtin acted promptly, scheduling the case for trial on December 6, 1976. Thereupon Mr. Detsky, just as he had effectively done in June and August on the eve of trial, moved *three days before trial* for a postponement, this time because of the death in Ireland of the mother of one of the defendants. Trial was adjourned until January 18, 1977.

Faced with trial on January 18, Detsky by letter dated January 12, 1977, to Judge Curtin offered to have defendant Aquarius Releasing, Inc., and perhaps Loew's Theatres, Inc., plead guilty if the case were dismissed as to the individual defendants and this time advised the court (as had been the case for almost 1½ years, see U.S. Attorney's letter of 7/28/75, App. 35) that the U.S. Attorney had refused to entertain the offer. Thereupon the court held a meeting on January 13, 1977, at which trial was adjourned to February 15, 1977, for reasons not appearing in the record. Thereafter the record proceeds in the same vein, with defense counsel, whenever the court was ready to try the case, successfully obtaining adjournments, either because Mr. Detsky was actively pursuing plea negotiations or was actively engaged in trial elsewhere (see, e. g., App. 77), or because he had filed new motions, such as a motion for change of venue, or the like.

With the aid of hindsight it is apparent that the trial court was altogether too liberal in permitting itself to be lulled by the defendants' extraordinarily successful delaying tactics into believing that postponements were reasonable and might lead to a

disposition of the case without trial. Part of their success was undoubtedly attributable to the court's lack of sufficient judicial personnel and its Herculean efforts to dispose of a huge backlog before July 1, 1979, the date when sanctions under the Speedy Trial Act go into effect. For present purposes, however, the important thing is that the defendants should not be rewarded for their own manipulation. To do so permits distortion, debasement and abuse of the right to a speedy trial under the Sixth Amendment, which was never intended to protect those who do everything within their power to delay or defeat the holding of a trial as long as possible. As the Supreme Court stated in *Barker v. Wingo*, "barring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial." 407 U.S. at 536, 92 S.Ct. at 2195. There are no such "extraordinary circumstances" in this case.

Both the reasons for the delay between indictment and trial and the lack of a timely assertion of speedy trial rights should weigh heavily against the defendants here. I cannot agree with the majority's conclusion that in determining whether a defendant's Sixth Amendment right to a speedy trial has been violated, time expended by the parties in plea negotiations should be weighed against the Government. Such negotiations are not a one-way street but a bilateral affair in which the defendant, not just the Government or the public, stands to benefit from any resulting compromise that is accepted by the court. A defendant's counsel is not obligated to engage in plea bargaining. When he does so, it is because he believes that the process is in his client's interest and that the prospect of benefit warrants the delay occasioned by the bargaining. Absent a showing of bad faith or an unjustified change of position on the Government's part (as was the case in *United States v. Carini*, 562 F.2d 144, 149 (2d Cir. 1977)), there is no reason to charge time devoted to plea bargaining against the Government rather than the defendant.

The defendant is not entitled to have it both ways—to negotiate what may turn out to be an advantageous disposition for him and, if no such disposition is reached, to claim a violation of his Sixth Amendment right to a speedy trial.

*United States v. Carini, supra*, relied on by the majority, is wholly inapposite. There the Government was directly responsible for the delay. In satisfaction of charges against Carini, the president of Carini Construction Co., the Government offered to accept a corporate guilty plea to a misdemeanor charging violation of 26 U.S.C. § 7512(b) by failing to deposit withholding taxes, provided he would demonstrate over a period of time his good faith by scrupulous compliance with the Internal Revenue Code's withholding requirement. More than a year was then allowed to pass without any plea being entered. Then the offer was withdrawn by the Government for policy reasons. The delay was properly assessed against the Government because the offer, due to its condition precedent, proposed an automatic delay which the defendant could not avoid if he wished to participate. See also *United States v. Roberts*, 515 F.2d 642, 647 (2d Cir. 1975). No such postponement or delay was proposed by any of the offers to plead in the present case. Moreover, except for one flat Government offer involving no delay and having no conditions precedent, the offers here all appear to have been proposals by the defendants, not the Government.

Nor can I agree with the majority's statement (p. 378 *supra*) that when the defendants "engaged in plea negotiations with the government to avoid the necessity of trial, . . . it is not unreasonable to assume that they were 'lulled into not pressing for trial' during that period," citing *United States v. Carini*, thus excusing defendants' long delay in asserting their right to a speedy trial. The record here is exactly to the contrary. The plea negotiations here were initiated and reinstituted by the defendants, notwithstanding the Government's flat refusal as early as September 30, 1975, to accept the proffered

corporate pleas in satisfaction of the charges against the individuals. The inference is inescapable that the defendants were using this tactic as a delaying maneuver. If anyone was "lulled" it was the Government, not the defendants.

Similarly, *United States v. Didier*, 542 F.2d 1182 (2d Cir. 1976), relied on by the majority for the proposition that the period during which a speedy trial motion was *sub judice* should not be charged against the defendant, is clearly distinguishable. There the motions to dismiss on speedy trial grounds were not filed on the eve of trial for the obvious purpose of seeking delay, as was the case here, but months before the first retrial date.

I also disagree with the majority's conclusion that the defendants have made any showing of prejudice as a result of the delay. Appellant Levene can hardly complain of "anxiety and concern" attributable to the long pendency of trial when the delay was largely of his own making and when he deliberately sought and obtained postponement of much earlier trial dates. More important the suggestion that the ability to present a defense may have been impaired by the delay strikes me as frivolous. If what appears in public media is any criterion, community attitudes toward explicit sex, assuming they have changed at all since 1973, have become more liberal and tolerant. In any event, it is unlikely that the view on that subject of actors and actresses who played parts in "Belinda" would carry any weight at all. The acid test would be the impressions created by a viewing of the film "Belinda" itself, summarized in Appendix A hereto, the notes of two FBI agents which were made as they viewed the film on January 31, 1973. Well aware that the film could be viewed by the court and jury, the two agents would have no motive other than to make an accurate record of what they saw. Appendix A demonstrates—as the jury's verdict confirms—that the chances of such hard, explicit pornography being saved by testimony of an art director or story editor were nil. Finding substitute witnesses for the art director and story editor should not pose a serious

problem. Moreover, as far as the record is concerned they may have disappeared long before 1975, when the case could first have been brought to trial but for the defendants' own delaying tactics.

For these reasons I believe the majority makes a grave mistake in reversing the convictions and dismissing the indictments on the ground that the defendants' Sixth Amendment right to a speedy trial was violated.

Nor can I agree that either of the two grounds advanced by Judge Oakes warrants reversal. The slight variance between the indictment and the proof at trial was clearly immaterial. "[C]onvictions are not now set aside except for variance resulting in substantial prejudice to the defendant." *United States v. Knuckles*, 581 F.2d 305, 312 (2d Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978).

Defendants Levene and Aquarius Releasing, Inc. were charged with knowingly transporting on or about January 26, 1973, an obscene film entitled "Belinda" in "interstate commerce, by means of common carriers, to wit, State Film Delivery, Inc., and Greyhound Lines-East, Inc., from the State of New Jersey to the City of Buffalo, in the State and Western District of New York" in violation of 18 U.S.C. §§ 1462 & 2. The evidence at trial, viewed in the light most favorable to the Government, as it must be, established that those two defendants knowingly transported the film "Belinda" on or about January 26, 1973, using the common carriers State Film Delivery, Inc. and Greyhound Lines-East, Inc., from New York City through the State of New Jersey to Buffalo, in violation of 18 U.S.C. §§ 1462 & 2. New Buffalo Amusement Corp. was charged with knowingly causing to be taken from Greyhound Lines-East, Inc. in Buffalo the film "Belinda" on January 26, 1973, in violation of 18 U.S.C. §§ 1462 & 2. The evidence, again viewed most favorably to the Government, established those allegations.

In short, out of the many details contained in the two relevant counts of the

indictment, the only alleged variance is that the indictment read *"from* the State of New Jersey to the City of Buffalo" rather than *"through* the State of New Jersey to the City of Buffalo." The date, the film, the two carriers, the destination, the names of the defendants and the sections of Title 18 were all completely accurate.

For a variance to be material, it is necessary that the prosecution rely at trial upon evidence and legal theories not "fairly embraced in the charges made in the indictment." *United States v. Garguilo,* 554 F.2d 59, 63 (2d Cir. 1977), quoting *United States v. Silverman,* 430 F.2d 106, 110 (2d Cir.), *modified on other grounds,* 439 F.2d 1198 (1970), *cert. denied,* 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971), and *Russell v. United States,* 369 U.S. 749, 793, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (Harlan, J., dissenting). The evidence and theory at trial here were "fairly embraced in the charges" because the essence of the interstate aspect of the indictment was that a particular obscene film had moved on a particular day on a particular common carrier between New Jersey and Buffalo. The jury found, under proper instructions, that the film actually moved "from the State of New Jersey to the City of Buffalo." Whether the film started in New Jersey or started elsewhere is not material as long as the Government proved passage from New Jersey to Buffalo occurred, with Buffalo as the destination point. The indictment itself does not literally allege that the film's transportation *began* in New Jersey.

The variance in the present case is far less important than that in *United States v. Knuckles, supra,* concurred in by my esteemed brother Oakes. In that case, the indictment contained a substantive count charging distribution of heroin and possession of heroin with intent to distribute on or about a certain date. The trial court charged the jury that it could convict if it found all elements of the offense established beyond a reasonable doubt even if the jury found that the substance was cocaine rather than heroin. This court rejected a claim of material variance, noting that "the *only* variance alleged by the appellants

is the exact nature of the substance involved, heroin or cocaine; the time, place, people, and object proved at trial are in all respects those alleged in . . . the indictment." *Id.* at 311 (emphasis in original). Such a variance "cannot have prejudiced the ability of the defendants to make their defense to the charge that they violated 21 U.S.C. § 841." *Id.,* citing *United States v. Garguilo, supra.* Since the defendants were "sufficiently apprised of the charges laid against them" and there was no danger of a second prosecution for the same offense, *id.,* the variance was not material and the conviction was affirmed even though presumably a "cocaine theory" was not presented to the grand jury.

In the present case, the variance is *a fortiori* immaterial. Whether the trip began in New Jersey and ended in Buffalo or began in New York City, went into New Jersey, and then continued from New Jersey to Buffalo does not affect the elements of the crime in the slightest. It certainly does not render the offense proved at trial a different crime from the one alleged in the indictment. Nor should it have affected defense counsel's preparation for trial. As Judge Oakes concedes, the defendants had the Greyhound Lines bus bill showing that the transportation of the film initiated from the New York City bus terminal. Since the indictment, literally read, only alleged that the film had passed from New Jersey to Buffalo and did not allege that the trip started in New Jersey, defense counsel had ample time to investigate whether such interstate passage actually occurred. Indeed, when the issue of the point of origin of the film's trip was first raised at trial, during the testimony of the second Government witness, defense counsel was well prepared. On cross-examination he asked the witness about a particular Greyhound bus route from New York City through Poughkeepsie to Albany to Buffalo without ever leaving New York State and he elicited the fact that routes were sometimes changed according to traffic conditions. There was no objection by defendants to the introduction of the testimony concerning the New Jersey

pass-through.[2] In short, this record fails to demonstrate prejudice or even surprise on the part of the defense that the interstate trip involved did not originate in New Jersey. The "several courses" suggested by Judge Oakes in hindsight were fully available to the defense through foresight as well.

*Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), which Judge Oakes regards as controlling, is easily distinguished. In *Stirone* the indictment charged that the defendant illegally obstructed the movement of sand in interstate commerce into Pennsylvania. The Government introduced evidence at trial that there was also illegal interference by the defendant with the prospective movement of steel out of Pennsylvania, and the jury was permitted to convict if either interference was established beyond a reasonable doubt. The Supreme Court reversed, holding that there was a material variance.

Judge Oakes appears to argue that the material variance in *Stirone* was solely that of exportation as compared to importation. Even if that were true, the alleged variance here is far less relevant. Proof of exportation from Pennsylvania involved not only a different product (steel) but a different aspect of interstate commerce than proof of importation of sand into Pennsylvania. Here the trip charged in the indictment is clearly the same trip as that proved at trial. The sole alleged variance here is whether the indictment implied that the trip started in New Jersey when in fact it started elsewhere and continued through New Jersey to Buffalo. Unlike *Stirone* the proof was not that the product was transported *from* Buffalo to New Jersey or was not in fact film at all.

In addition, this court has already adopted the distinction made by Judge Leventhal in *Jackson v. United States*, 123 U.S.App. D.C. 276, 279, 359 F.2d 260, 263, *cert. denied*, 385 U.S. 877, 87 S.Ct. 55, 17 L.Ed.2d 62 (1966): "[i]n *Stirone* the prosecution was relying at trial on a complex of facts distinctly different from that which the grand jury set forth in the indictment." See *United States v. Knuckles, supra*, 581 F.2d at 312. In *Stirone*, the indictment was concerned with the movement of sand, whereas the evidence at trial included the prospective movement of steel at a later point in time. This is obviously "a complex of facts distinctly different" from the indictment. In the present case, the only alleged variance involves one very minor detail— whether the trip started in New Jersey or started elsewhere and continued through New Jersey. The date, the film, the carriers, and the people involved were all the same. *Stirone* would be applicable if the Government had convicted the defendants on evidence of a later shipment of a different film, but that is obviously not this case.

Judge Oakes also suggests that 18 U.S.C. § 1462 requires proof that the defendants have knowingly used interstate commerce for the shipment of the film, as compared to proof that they knowingly used a common carrier which then in fact traveled in interstate commerce. I cannot agree.

The statute imposes a fine or imprisonment, or both, on anyone who "brings into the United States, or any place subject to the jurisdiction thereof, or knowingly uses any express company or other common carrier, for carriage in interstate or foreign commerce—(a) any obscene, lewd, lascivious, or filthy . . . motion-picture film . . . ." The statute also applies to anyone who "knowingly takes from such express company or other common carrier any matter or thing the carriage of which is herein made unlawful . . . ." See 18 U.S.C. § 1462.

Judge Oakes apparently concedes that the latter portion of the statute does not require knowledge by the recipient of the film removed from the common carrier that it had actually been transported in interstate commerce, see footnote 3 of the concurring opinion, since Judge Oakes does not

---

**2.** Defendants did object to the admission into evidence of Government Exhibit 10, the Greyhound bus schedule.

feel that New Buffalo can avail itself of this argument.[3] But it is unclear why an additional knowledge element must be proved against the shipper as compared to the recipient. Such an internal inconsistency in the elements of the offense should not be lightly attributed to Congress.

The purpose of the statute is "to prevent the channels of interstate commerce from being used to disseminate" obscene material. *United States v. Alpers*, 338 U.S. 680, 683, 70 S.Ct. 75, 94 L.Ed. 492 (1950). Since Congress "has a legitimate interest in protecting the public commercial environment by preventing such [obscene] material from entering the stream of commerce," the Constitution permits Congress to undertake "comprehensive federal regulation of interstate transportation of obscene material." See *United States v. Orito*, 413 U.S. 139, 143, 93 S.Ct. 2674, 2678, 37 L.Ed.2d 513 (1973). That is exactly what Congress has done in 18 U.S.C. § 1462.

It is reasonable for Congress to view the common carrier as the important entrance into the stream of interstate commerce. A carrier such as the Greyhound bus company is obviously integrally connected with interstate commerce; even if a Greyhound bus does not cross state lines, it almost invariably travels on interstate highways or purposefully connects with other buses which do.[4] The common carrier is an important

aspect of the "public commercial environment" which Congress is protecting. The Greyhound bus schedule which was admitted into evidence at trial well demonstrates how involved the common carrier is with interstate and foreign commerce even if one portion of the trip is purely intrastate.[5]

Congress requires that the defendant knowingly use a common carrier to transport obscene material. That knowing use of a common carrier establishes that the defendant is willing to pollute the public commercial environment with obscenity. The additional requirement that there be "carriage in interstate or foreign commerce" simply establishes federal jurisdiction. Given the comprehensive purpose behind 18 U.S.C. § 1462 and the broad power of Congress pursuant to the Commerce Clause, see *United States v. Orito, supra*, 413 U.S. at 143–44, 93 S.Ct. 2674, it would be improper for this court to create an additional knowledge requirement in order to cut back on the reach of the statute. The statute does not on its face require knowledge that the common carrier will actually move across state lines, and there is no policy reason to support inferring such a requirement.

In view of the majority's decision, no purpose would be served by a discussion in this dissent of the other issues raised by the appellants.

3. Appellants as well focus only on Levene and Aquarius in raising this argument; New Buffalo is relegated to one footnote.

4. It could be argued that the obscene material need not cross state lines at all, as long as the *common carrier uses channels of interstate commerce such as interstate highways.* However, since the jury found beyond a reasonable doubt, following the instructions of the trial court, that the common carrier in fact crossed the state line from New Jersey to New York, that issue is not before this court.

5. According to the only Greyhound bus timetable in evidence, Greyhound Timetable No. 70, Government Exhibit 10, there were in January, 1973, 10 bus trips scheduled daily from New York, NY, to Buffalo, NY (Nos. 339, 3201, 331, 3300, 1505, 351, 3211, 1509, 1511, 333), all but one of which (No. 3300) stopped at Paramus, New Jersey. Moreover, all but one of the 10

trips (No. 3300) were scheduled to proceed on to Toronto or London, Canada, some after a brief delay in Buffalo, which confirms the predominately interstate and foreign nature of the commerce involved.

Judge Oakes refers (in Footnote 1 to his opinion) to other routes shown in the January, 1973, edition of a publication entitled "Russell's Official National Motor Coach Guide," which is not in evidence, is not referred to in the trial record, and has not been furnished to the court. The only reference to it is in Footnote 31 to appellant's brief.

Since the Russell's guide is not in evidence, has not been made available, and may not accurately reflect the actual Greyhound bus schedule in effect between New York and Buffalo on January 26, 1973, I am unwilling on this appeal to place any reliance upon it.

## APPENDIX A

*Notes of Special Agents Allan M. Davison and John F. Lewis Summarizing Contents of Film "Belinda" as Viewed by Them on Jan. 31, 1973*

"The color, sound film began at approximately 12:10 PM and ended at approximately 1:28 PM. The credit at the beginning of the film indicated it was produced by the Aquarius Releasing, Inc., and the film begins with a group of people, including a person dressed in clerical garb, looking at what is assumed to be a corpse in the identification room of a hospital. The next scene shows a 'detective' interviewing an individual in a tavern and requests his cooperation in the investigation. The person in clerical garb arrives with the others from the hospital and is identified as Father KEENE (phonetic). The person being interviewed by the detective begins to tell the story about his knowledge of the deceased. The scene shifts to a picture of an individual identified as MILLER, who is dragging and shoving BELINDA across a snow covered hill and icy area. MILLER throws her down and rubs his hands over her clothing and BELINDA's boyfriend, DOUG, who has been watching, jumps MILLER and they begin to fight. The scene then shifts to a room where DOUG and BELINDA are kissing while on a couch.

"The next scene shows DOUG with a woman who is enticing him in what is an infra-red type scene with all red lighting. The woman performs fellatio on DOUG. The scene then shifts to a room where a black female is performing fellatio on MILLER who is a white male. The next scene shows conversation among the participants back at the tavern. The next group of scenes alternate between the black woman performing fellatio on MILLER and the other woman performing fellatio on DOUG.

"Following this, the scene shows DOUG kissing the breasts of the woman he is with and thereafter engaging in intercourse with her. The scene then shifts to MILLER masturbating the black woman with his finger and then back to DOUG engaging in intercourse with the woman with her on her hands and knees and him behind her. The scene then shifts back to MILLER masturbating the black woman and back to DOUG engaging in intercourse with the woman. The scene then shows DOUG ejaculating on the stomach of the woman. The final scene in this series shows MILLER rubbing and masturbating the black woman with his finger. The next scene shows BELINDA defaced in a bedroom looking in a mirror while dialogue is carried on the soundtrack.

"The next scene shows MILLER and the black woman in bed together at which time MILLER gets out of bed and gets an automatic type handgun and tells the woman that this is how he has money coming in as he waves the gun in front of her. While MILLER talks to the woman, she caresses his penis with her hand. The next scene shows DOUG in the bedroom talking to BELINDA and urging her not to go with MILLER.

"The next scene shows MILLER in bed with the black woman after which time he gets out of bed, goes to the door, knocks, and asks for WILLIAM. He then enters the room, which apparently is a bathroom as there is a female sitting on the toilet stool when he enters the room. This appears to be the same female who earlier had been pictured with DOUG. The female then while continuing to sit on the stool, performs fellatio on MILLER who is standing in front of her. The black woman is then pictured in bed, groaning and rubbing herself. The scene, from an angle below MILLER, and the girl looking up from the floor, shows them rubbing each other and thereafter engaging in intercourse. The scene then shifts back to the bedroom where the black woman is self-masturbating. MILLER and the white female come into the bedroom where MILLER engages in intercourse with the white woman while the black woman is kissing the white woman. The black woman then kisses the buttocks of MILLER while he is engaged in intercourse with the white female.

"The next scene shows DOUG and BELINDA conversing in a bathroom.

"The scene shifts back to a room where MILLER and the black woman and white woman are in bed talking. MILLER is holding the gun and a second white male, identified as WILLIAM, enters the room and all four sit on the bed and talk. An argument then ensues between MILLER and WILLIAM and thereafter between MILLER and the white female. The scene then shifts to a tavern where further dialogue then takes place between the participants there.

"The story continues with BELINDA meeting MILLER 'on the edge of town' where she enters a house with him and MILLER gets into an argument with the black woman where he shoves her and tells her to leave. While this is transpiring, WILLIAM goes to the couch where BELINDA is seated and puts his hand on her leg. MILLER shoves him away and then sits down on the couch where he begins to rub BELINDA's breasts and legs. She resists him and at the same time, the black woman begins to caress WILLIAM. At this point, the other white woman comes down the stairs and enters the room. MILLER and WILLIAM get into an argument with the black woman and white woman and attempt to get them to leave and thereafter WILLIAM forcefully escorts the black woman and the white woman out the front door. MILLER then grabs BELINDA and tells her she will give him whatever he wants to which she responds, 'Doug's the only one.'

"The next scene shows discussion continuing at the tavern.

"The next scene is again of an infra-red type which shows the black woman and the white woman kissing and rubbing each other's bodies and thereafter the white woman kisses the black woman's breasts, performs cunnilingus on her, and thereafter inserts an artificial penis into the black woman's vaginal opening. The scene ends with the black woman and white woman in a simulated intercourse position. The scene then shifts back to the tavern where the detec-tive decides to leave and the story continues.

"The next scene is again an infra-red type scene which shows BELINDA, WILLIAM and MILLER dancing and MILLER caressing BELINDA's breasts while she is still clothed. MILLER proceeds to undress her and thereafter kiss and caress her breasts.

"The next scene reverts back to the tavern where a 'psychiatrist' enters the conversation and thereafter the entire group leaves the tavern.

"The next scene is again an infra-red type which shows BELINDA sitting and standing in a full-length corset. It then shows her entering a bedroom, removing her nylons, and corset, and getting into bed with DOUG who is laying nude. They begin to kiss and caress each other at which time DOUG kisses her breasts and removes her panties. He then performs cunnilingus on her and thereafter assume a simulated intercourse position.

"The next scene shows a theater marquis with a title 'Belinda' on it and shows the person being interviewed at the tavern entering the theater. The next scene shows DOUG standing nude in a room with his arms outstretched over his head and tied to ropes with a rope running between his hands. MILLER, BELINDA and WILLIAM enter the room and MILLER begins to taunt DOUG. WILLIAM begins to wrestle with BELINDA on a bed with her resisting him. The movie concludes with the scene of the theater marquis with 'Belinda' on it and people leaving the theater.

"Individuals listed on the final crediting included TERRY LEVENE and the star as having been MELINDA FORREST."