UNITED STATES of America,
Plaintiff-Appellee,

v.

Eugene DiFRANCESCO,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellant,

v.

Eugene DiFRANCESCO,
Defendant-Appellee.

Nos. 231, 908 and 1094, Dockets 78–1250, 78–1369 and 78–1371.

United States Court of Appeals,
Second Circuit.

Argued April 20, 1979.

Decided Aug. 6, 1979.

772

Harold J. Boreanaz, Buffalo, N.Y. (Boreanaz, NeMoyer & Baker, Buffalo, N.Y.), for defendant-appellant, defendant-appellee DiFrancesco.

Victor D. Stone, Atty., Dept. of Justice, Washington, D.C. (Richard J. Arcara, U.S. Atty., for the Western District of New York, Jerome M. Feit, Atty., Dept. of Justice, Washington, D.C., of counsel), for plaintiff-appellee, plaintiff-appellant United States.

Before SMITH and MESKILL, Circuit Judges, and HAIGHT,* District Judge.

J. JOSEPH SMITH, Circuit Judge:

These are appeals by a defendant from judgments of conviction entered after two separate jury trials in the United States District Court for the Western District of New York, and by the government from a sentence imposed under the "dangerous special offender" provisions of 18 U.S.C. § 3575. In the first trial, Harold P. Burke, *Judge,* presiding, the appellant, Eugene DiFrancesco, was convicted of conspiring to participate in and conduct the affairs of an enterprise through a pattern of racketeering activity, which included multiple acts of arson and use of the mails to defraud insurance companies, in violation of 18 U.S.C. § 1962(c) and (d). In the second trial, George C. Pratt, *Judge,* presiding by designation, DiFrancesco was convicted on three counts which alleged that he willfully caused damage in excess of $100 to federal property, 18 U.S.C. § 1361, unlawfully stored explosive materials, 18 U.S.C. § 842(j), and conspired to commit these acts, 18 U.S.C. § 371. We affirm the convictions and dismiss the government's appeal.

On July 24, 1975, DiFrancesco, together with seven co-defendants, was indicted on charges arising out of a series of bombings that occurred in the Rochester area on Columbus Day in 1970. A second indictment, filed on April 7, 1976, named DiFrancesco and seven others, two of whom were also

* Honorable Charles S. Haight, Jr., United States District Judge for the Southern District of New York, sitting by designation.

defendants in the bombing indictment, as defendants in two counts of racketeering involving an "arson-for-hire" ring operating in the Rochester area. Since this second indictment was the first to come to trial, we shall begin by discussing DiFrancesco's appeal from the resulting conviction on the racketeering charges.

## RACKETEERING

DiFrancesco and five of the seven co-defendants in the racketeering indictment were tried jointly, in September and October of 1977. Of the two remaining defendants, Joseph LaNovara pleaded guilty before trial and testified as a witness for the government, while Frank Valenti, the alleged leader of the conspiracy, was severed upon the government's motion because he was ill.

The government presented evidence by which it sought to prove that an arson-for-hire team, which operated as part of a larger organization engaged in illicit activities in the Rochester area, had been responsible for at least eight fires that occurred there between 1970 and 1973. The arson ring allegedly agreed with the property owners to destroy their buildings in return for a share of the insurance proceeds. The government charged that insurance companies had been defrauded of about $480,000 as a result of the eight fires. The jury acquitted four of the six defendants, but convicted DiFrancesco and Vincent Rallo on both counts. DiFrancesco's appeal alleges several errors in the district court.

The most substantial issue raised by DiFrancesco is whether certain statements made by government witnesses to the FBI should have been turned over to the defendants under the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Shortly before this trial began, it was disclosed that allegations of wrongdoing had been lodged against some members of the Monroe County Sheriff's Office. These allegations arose in connection with the Sheriff's Office's investigation of a number of crimes in which the defendants in this case allegedly had been involved, including a murder for which DiFrancesco had been convicted in state court. The FBI, as part of a federal civil rights investigation of the Sheriff's Office's activities, conducted a number of interviews and compiled interview reports.[1] The subject matter of some of these interviews included alleged instances of perjury by witnesses in state court proceedings. Some of these witnesses were expected to be called by the United States to testify in the case against DiFrancesco and his co-defendants.

When this matter arose, Judge Burke granted a continuance for one week during which the government represented that it would seek to learn more about the allegations and would then "turn over all materials that is [sic] favorable to the defense that result from the investigation." The government reviewed approximately thirty to thirty-five FBI reports and determined that only one was Brady material. The government then submitted the reports to the trial judge to allow him to decide whether he thought any of the remaining material fell within Brady. The judge picked out about fifteen other reports which he ruled were Brady material, but the government refused to turn over these additional reports to the defendants. It argued that exposure of the reports could endanger the ongoing civil rights investigation. Thus, the government stated that it was "willing to stand or fall on that decision [that the reports were not Brady material] made by itself." The court denied a motion that it order the government to turn over the reports. Instead, those reports which the court believed were Brady material were sealed as Court Exhibit A, and those which the court and government agreed were not within Brady were sealed as Court Exhibit B. At some later time, the government gave defense counsel the reports of interviews of LaNovara and of

---

1. This investigation resulted in the filing of an indictment in the Western District on April 12, 1979 against five members of the Monroe County Sheriff's Office. *United States v. Kennerson,* Cr. 79–65.

Angelo Monachino, an unindicted co-conspirator, who was to testify for the government. Both of these reports were part of Court Exhibit A, as was a third report which the government eventually turned over as Jencks Act material.

▌ Our examination of the court exhibits convinces us that the reports included no *Brady* material. None of the reports exculpated DiFrancesco, nor did any demonstrate that the government's case included perjured testimony. Furthermore, nothing in the reports that the government refused to turn over constituted "material evidence that would impeach a Government witness whose 'reliability . . . may well [have been] determinative of guilt or innocence.' " *Ostrer v. United States,* 577 F.2d 782, 785 (2d Cir. 1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 73 (1979), *quoting Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), *quoting Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). One report (Part A of Court Exhibit A) contains two comments attributed to Monachino. Neither of these comments, however, could have been used to impeach Monachino in any way that might have affected the outcome of the trial, which is the standard by which we measure the materiality of undisclosed information for which the defendant makes a specific request. *United States v. Agurs,* 427 U.S. 97, 104–06, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Ostrer, supra,* 577 F.2d at 786. In short, the FBI reports would have added nothing to the vigorous attacks which DiFrancesco and his co-defendants made upon the credibility of a number of the government's witnesses through use of the substantial public information relating to the investigation.

▌ DiFrancesco also raised several arguments involving evidentiary questions and portions of the court's instructions to the jury. The first concerns the introduc-

tion into evidence of a state court indictment that charged DiFrancesco and others with an act of arson, a fire at Select Tire Company, that also constituted part of a specific act of racketeering alleged in the federal indictment. The government offered the indictment and had a portion of it read to the jury as part of its rebuttal case, for the stated purpose of making the jury aware of the final disposition of the state court case against one of the persons named in the state indictment.

It is difficult to perceive how the indictment was relevant for the purpose stated by the government. In fact, its relevance and materiality to any issue in the case was, at best, minimal. Counsel for the various defendants, including DiFrancesco, opened up the subject of the state court proceedings in their cross-examination of government witnesses. Introduction of the indictment, however, was not, as the government now contends, necessary to clarify the "meaning" of the outcome of the state trial.[2] But admission of the indictment, even if erroneous, did not prejudice DiFrancesco. The jury already knew, from the defendants' cross-examination of government witnesses, that the state grand jury had received testimony implicating DiFrancesco in the Select Tire fire, that some persons had been tried in state court in connection with that fire, that testimony alleging DiFrancesco's participation had been offered at the state court trial, and that DiFrancesco had been named as a co-conspirator in yet another federal indictment alleging mail fraud arising from a separate act of arson. Under these circumstances, admission of the indictment, even if erroneous, was harmless.

▌ DiFrancesco also disputes the admissibility of certain testimony by LaNovara and Monachino, who described the initiation

---

2. Only two of the defendants named in the state court indictment had been tried. The jury acquitted Joseph Nalore, one of DiFrancesco's co-defendants in this case, but was unable to agree on a verdict as to Lawrence Uchie.

Uchie then entered an "*Alford* plea" of guilty, see *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), to the state charges, while at the same time maintaining his innocence.

ritual[3] followed by the organization of which the arson-for-hire ring was a part. Admission of this testimony was not erroneous. The evidence was probative of the existence of an "enterprise," the affairs of which were conducted through a pattern of racketeering activity, which was a matter on which the court correctly charged that the government had the burden of proof. The evidence was sufficiently probative to outweigh any possible prejudice.

■ DiFrancesco next contends that the testimony that LaNovara and Monachino were participants in the Federal Witness Protection Program, as authorized by the Organized Crime Control Act of 1970, P.L. No. 91–452, Title V, 84 Stat. 933, should not have been allowed. Since a defendant often will seek to impeach a participating witness by showing that he has received significant benefits while in the program, the government may desire to bring out the witness' participation during direct examination in order to avoid an inference that the government was attempting to hide the witness' possible bias. Although disclosure of such participation "must be handled delicately," *United States v. Partin*, 552 F.2d 621, 644–45 (5th Cir.), *cert. denied*, 434 U.S. 903, 96 S.Ct. 1493, 47 L.Ed.2d 753 (1977), so as to minimize the possibility that the jury will infer that the defendant was the source of danger to the witness, such testimony is permissible so long as the prosecutor does not attempt to exploit it. No exploitation occurred here, and the defendants cross-examined the witnesses at length to develop the full extent of the benefits received by them. Thus there was no error in allowing the testimony. Nor was the court's instruction to the jury on this subject erroneous or insufficient.[4] The instruction did not suggest, as DiFrancesco argues, that the Attorney General was vouching for the credibility of the witnesses. Instead, it simply explained the purpose of the program and dispelled any implication that the benefits received by LaNovara and Monachino were bestowed improperly. No additional instruction was necessary. *Id.*

■ Lastly, DiFrancesco argues that the court removed an element of the crime from the jury's consideration by instructing that, if the jury believed the evidence that about $480,000 in claims was paid by insurance companies in New York and other states as a result of the arsons and mail fraud, then the enterprise did affect interstate commerce as required by 18 U.S.C. § 1962(c). This instruction was proper. The court left to the jury the question of fact, whether the claims had been paid as a result of arson engaged in by the defendants. The trial judge correctly determined, however, that if the defendants' alleged actions were proven, the effect of those actions on interstate commerce was a question of law. *Cf. United States v. Ricciardi*, 357 F.2d 91, 94 (2d Cir.), *cert. denied*, 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 540 (1966) (whether activities constitute an "industry affecting commerce" under 29 U.S.C. § 186 is a question of law); *United States v. Varlack*, 225 F.2d 665, 670–72 (2d

3. The ritual, which included the recitation of an oath of loyalty to the organization, consisted of pricking one's trigger finger, absorbing the blood in a tissue and holding the tissue in one's hand while it burned.

4. The court instructed the jury:

You have heard numerous references during the course of this trial to the Federal Witness Protection Program. Federal law provides that the Attorney General of the United States is authorized to provide for the security of government witnesses, potential government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in any organized crime activity.

Federal law also provides that the Attorney General of the United States is authorized to provide for the health, safety and welfare of witnesses and persons intended to be called as government witnesses and the families of witnesses and persons intended to be called as government witnesses in legal proceedings instituted against any person alleged to have participated in an organized crime activity whenever in his judgment testimony from, or a willingness to testify by such a witness would place his life or person or the life or person of a member of his family or household in jeopardy.

Cir. 1955) (judge instructed that, if jury believed testimony of government witnesses, defendant's acts affected commerce as defined in Hobbs Act, 18 U.S.C. § 1951).

## THE COLUMBUS DAY BOMBINGS

DiFrancesco's attack on his conviction arising from the bombing and explosives charges focuses on the delay between his indictment and the commencement of trial. He contends that the indictment should have been dismissed because this delay violated the Speedy Trial Act, 18 U.S.C. §§ 3161–74 ("the Act"), the Western District's Transitional Plan for Achieving the Prompt Disposition of Criminal Cases ("the Plan"), and the sixth amendment's guarantee of a speedy trial.

■ DiFrancesco was indicted on July 24, 1975 and arraigned on September 8, 1975. The relevant provisions of the Act, 18 U.S.C. §§ 3161(g) and 3163(b)(2), and of the Plan, § 5(a)(1), did not take effect until July 1, 1976. They require that trial of a defendant arraigned before the effective date shall commence within 180 days of that date. Both the Act and the Plan (§ 10(a)) provide, however, for the exclusion of certain periods of delay set forth in 18 U.S.C. § 3161(h) in computing the 180-day period. DiFrancesco contends that the non-excludable delay in this case amounted to 309 days. The government, which conceded in the district court that the 180-day period had expired, now argues that the non-excludable delay totaled either 283, 273, 177 or 145 days, or perhaps no time at all. We need not choose, however, from among these various calculations, because 18 U.S.C. § 3163(c) delays the effective date of the sanctions provided in § 3162 for violations of the Act until July 1, 1979, *United States v. New Buffalo Amusement Corp.,* 600 F.2d 368 at 376–377 (2d Cir. 1979); *United States v. Carini,* 562 F.2d 144, 148 (2d Cir. 1977), and § 11(e) of the Plan provides that failure to comply with its provisions shall not require dismissal. *New Buffalo Amusement Corp., supra,* at 376 n.13.

■ Although the district court retains discretionary power under Rule 48(b) of the Federal Rules of Criminal Procedure to dismiss an indictment because of excessive delay, *United States v. Lane,* 561 F.2d 1075, 1078 (2d Cir. 1977), DiFrancesco did not invoke that discretion and thus cannot complain of the court's failure to exercise it. *New Buffalo Amusement Corp., supra,* at 376 n.13.

■ We turn therefore to DiFrancesco's claim that the pretrial delay violated his sixth amendment right to a speedy trial. We shall assume for this purpose that the delay exceeded that allowed under the Act and the Plan, since such a violation may be considered in assessing the merit of a constitutional speedy trial claim. *Id.* at 2758; *Carini, supra,* 562 F.2d at 148, 151–52. Nonetheless, we agree with the district judge's thorough and well-reasoned opinion in which he concluded that DiFrancesco's claim lacks merit. *United States v. DiFrancesco,* Cr. 75–165 (W.D.N.Y. April 3, 1978).

■ The controlling authority is of course *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in which the Court enunciated four factors to be considered in evaluating a claim of a denial of the right to a speedy trial. These factors are (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the existence of prejudice to the defendant from the delay. *Id.* at 530, 92 S.Ct. 2182. Other relevant circumstances also may be considered in conducting a "difficult and sensitive balancing process," *id.* at 533, 92 S.Ct. 2182, "in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 530, 92 S.Ct. 2182, 2192.

■ The delay between indictment and trial in this case was about 30 months. The government concedes that this is sufficient to "trigger" a further investigation of the other factors. *See id.* at 530–31, 92 S.Ct. 2182; *Carini, supra,* 562 F.2d at 148–49. The reasons for the delay were numerous, including trials of DiFrancesco on state charges and the federal racketeering charges, illness of his attorney and of Judge

Burke, to whom the case originally was assigned, the participation of DiFrancesco's attorney in a trial on behalf of another client (during which time Judge Burke denied the government's request to remove the attorney from this case), and the pendency of motions by the defendants and the government. Although the government bears the responsibility for some of the delay, including that caused by "institutional factors" such as overcrowding of the district court's docket, *Barker v. Wingo, supra,* 407 U.S. at 531, 92 S.Ct. 2182, there is no suggestion in the record of any "deliberate attempt [by the government] to delay the trial in order to hamper the defense," *id.,* and it is apparent that DiFrancesco was responsible for a substantial portion of the delay. Moreover, the government repeatedly moved to set a trial date, a fact which distinguishes this case from *United States v. Vispi,* 545 F.2d 328, 334 (2d Cir. 1976). DiFrancesco, on the other hand, did not assert his speedy trial claim until the eve of trial.[5]

The final factor, prejudice to the defendant, also fails to support DiFrancesco's claim. He argues that the death of a potential witness, Samuel DiGaetano, caused substantial prejudice which can be attributed to the delay. DiGaetano, attorney for severed co-defendant Frank Valenti, allegedly would have testified, in direct contradiction of a government witness, that Valenti was in Pittsburgh on the day of and the day immediately preceding the bombings.[6]

We find no error in the district court's conclusion that the evidence presented to it failed to support the contention that DiGae-

tano would have given such testimony. Moreover, although DiGaetano's death apparently was caused by a heart condition from which he had suffered for a substantial period of time, DiFrancesco made no effort to preserve by deposition the testimony that purportedly would have been given. In addition, as the district court noted, DiFrancesco's motion and supporting materials contained no affidavit from Valenti concerning his whereabouts on October 11 and 12. Although Valenti was too ill to undergo trial at the same time as his co-defendants, there is no indication that his illness prevented him from asserting, by affidavit or any other means, his presence in Pittsburgh on the days in question.[7]

Even if we assume then that the Plan and Act were violated and weigh such violation in our analysis of DiFrancesco's claim, the balance tips strongly against his contention that his right to a speedy trial was violated.

DiFrancesco next argues that the court should have severed or declared a mistrial as to Count II of the indictment because of an error that was not discovered until the conclusion of the presentation of the government's case. At that time it was learned that the language contained in Count II of the copies of the indictment possessed by counsel for both the government and the defendants differed from that in the copy filed with the court. The prosecutor mistakenly had distributed copies of an earlier draft of the indictment, rather than the final, filed version. The earlier draft, which all counsel had assumed to be the actual indictment, named Valenti as the person who caused the damage to the old

---

5. Two of DiFrancesco's co-defendants, but not DiFrancesco himself, moved for dismissal of the indictment in March 1977, alleging a violation of the Speedy Trial Act. These motions of course do not evidence any assertion by DiFrancesco of *his* right to a speedy trial.

6. The government contended at trial that Valenti arranged and conducted a meeting in Rochester on October 11, 1979, at which the bombings were planned, and that he also took part in the bombings.

7. The absence of evidence to support the claim of prejudice perhaps is explained by Valenti's subsequent plea of guilty, entered on February 15, 1979 before Judge Curtin, to one count of the indictment in this case. Valenti entered his plea after the attorney for the Department of Justice had recited a summary of the testimony which the government would have offered if the case against Valenti had gone to trial. This included testimony placing Valenti in Rochester on October 11 and 12. Valenti offered no objection or comment in response to this summary.

Federal Building and named the other defendants, including DiFrancesco, as aiders and abettors.[8] The actual indictment named all the defendants as principals and, in addition, merely cited 18 U.S.C. § 2, the aiding and abetting statute.[9]

DiFrancesco complains that as a result of this confusion, for which he bore no fault, he was convicted under a theory at substantial variance from that which he had a right to believe was the basis of the case. He argues that the assumed indictment was more narrowly drawn than the actual, and that therefore, the substitution of the actual version was forbidden by *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), which holds that a broadening of the charges may only be accomplished by the grand jury itself.

■ The decision in *Stirone,* however, is not relevant to the circumstances presented here. The Court relied in *Stirone* on the violation of "the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Id.* at 217, 80 S.Ct. at 273. There is no question that the count on which DiFrancesco ultimately was tried and convicted actually was returned by the grand jury, thus protecting his right to have his jeopardy limited to "offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Id.* at 218, 80 S.Ct. at 273. DiFrancesco's real claim is that he was not afforded notice of the charge on which he was convicted. As the Supreme Court explained in *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935), one of the reasons "that allegations and proof must correspond is . . . the obvious [requirement] that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial . . . .." The protection of this right to notice of the charges requires a determination "whether there has been such a variance as to 'affect the substantial rights' of the accused." *Id.; United States v. Knuckles*, 581 F.2d 305, 311 (2d Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *see United States v. Garguilo*, 554 F.2d 59, 63 (2d Cir. 1977).

No such prejudicial variance occurred here. Although the assumed indictment was drawn somewhat more narrowly than was the actual indictment, the evidence introduced and the theory of culpability advanced by the government were not affected by the difference. The government offered no evidence as to who actually delivered the bomb to the Federal Building. Its

**8.** Count II of the draft of the indictment charged:

 THAT, on or about October 11 and 12, 1970, in the Western District of New York, the Defendant herein, FRANK J. VALENTI unlawfully did wilfully cause the wilful injury to and commission of depredations against the property of the United States of America and the departments and agencies thereof—namely the premises known as the (old) Federal Building located at Church and Fitzhugh Streets in the City of Rochester, New York—the damages to the said premises having exceeded the sum of $100:

 AND, at the time and place aforesaid, RENE J. PICCARRETO, SALVATORE GINGELLO, THOMAS DIDIO, DOMINIC CELESTINO, EUGENE DI FRANCESCO, ANGELO VACCARA and ANTHONY GINGELLO, the Defendants herein, unlawfully did aid, abet, counsel, command, induce and procure the commission of the aforesaid offense, all of which was in violation of the provisions of Sections 1361 and 2 of Title 18 of the United States Code.

**9.** Count II of the filed indictment charged:

 THAT, on or about October 11 and 12, 1970, in the Western District of New York, the Defendants herein, FRANK J. VALENTI, RENE J. PICCARRETO, SALVATORE GINGELLO, THOMAS DIDIO, DOMINIC CELESTINO, EUGENE DI FRANCESCO, ANGELO VACCARO and ANTHONY GINGELLO unlawfully and wilfully did injure and cause injury to and the commission of depredations against the property of the United States of America and the departments and agencies thereof—namely, the premises known as the (old) Federal Building located at Church and Fitzhugh Streets in the City of Rochester, New York—the damages to the said premises having exceeded the sum of $100, all of which was in violation of the provisions of Sections 1361 and 2 of Title 18 of the United States Code.

evidence supported the narrower charge that Valenti "caused" the damage to the building because he directed the conspiracy. Finally, the government withdrew the aiding and abetting theory and proceeded on the "*Pinkerton*"[10] theory that each defendant was responsible for the substantive acts of his co-conspirators carried out in furtherance of the conspiracy. This theory would have been permissible under either version of Count II.

DiFrancesco's claim of prejudice is unsubstantiated. He contends that, had he known the actual wording of the indictment, he would have conducted additional cross-examination of Monachino and would not have entered into certain stipulations. This contention is undermined, however, by counsel's failure to ask the trial court to recall Monachino for further cross-examination and his failure to withdraw any of the stipulations, which had not yet been given to the jury. Since the difference in the two versions of the indictment caused no prejudice to any substantial rights of the accused, the district court did not err in denying severance or a mistrial.

■ DiFrancesco's final argument involves Count VI, which accused him of unlawfully storing explosives. He contends that this count should have been dismissed because there was no proof presented that the storage continued after February 12, 1971, the effective date of 18 U.S.C. § 842(j), which he was charged with violating. We disagree.

The government offered evidence that, during the summer of 1970, DiFrancesco brought two boxes that contained dynamite, guns and various other items to a house in which Joseph Turri lived. DiFrancesco received permission from Turri to store the boxes in the basement. On the night of October 11, DiFrancesco removed a burlap bag from the box and brought it upstairs to Turri's apartment, where a meeting of the conspirators was held. There they used some of the material in the bag—dynamite, fuses and blasting caps—to construct the explosive devices which were used in the bombings. After the bombs had been made, the remaining material was put back into the bag. DiFrancesco then left the room with the bag and returned without it a short time later. No one actually saw DiFrancesco return the bag containing the remaining explosives to the basement. Turri testified that he moved the boxes from the basement to the attic of his new residence during the summer of 1971. Turri's wife testified that DiFrancesco called her at some time in 1973 and asked her to move the boxes from the attic to another location, which she did.

Although none of the witnesses actually examined the contents of the boxes after the effective date of the statute, the jury properly could have inferred that some of the explosives remained in the boxes after that time. The evidence supported a logical inference that, when DiFrancesco left the October 11, 1970 meeting for several minutes and returned without the burlap bag, he had returned the bag containing the remaining explosive materials to the boxes in the basement, and that the explosives remained in the boxes while Turri moved them to his new residence and until DiFrancesco asked that they be moved again in 1973.

## GOVERNMENT APPEAL OF THE SENTENCE

Prior to the start of DiFrancesco's trial on the racketeering counts, the government, in compliance with 18 U.S.C. § 3575(a), filed a notice with the district court alleging that DiFrancesco was a "dangerous special offender," as defined in 18 U.S.C. § 3575(e)(3) and (f). The filing of such a notice indicates the government's intention to seek, if the defendant is convicted, imposition of an enhanced sentence as authorized by 18 U.S.C. § 3575(b).

On March 17, 1978, after DiFrancesco had been convicted in both the racketeering and bombing trials, Judge Burke held a sentencing hearing, required by § 3575(b), to obtain information which, with that submitted

**10.** *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

during trial, would form the basis for his determination whether DiFrancesco was a dangerous special offender. On April 21, the court issued findings of fact and its conclusion that DiFrancesco was a dangerous special offender. *United States v. DiFrancesco*, Cr. 76–45 (W.D.N.Y. April 21, 1978). One week later, the court sentenced DiFrancesco to concurrent ten-year terms of imprisonment on the two racketeering counts, to be served concurrently with sentences totaling nine years which had been imposed by Judge Pratt on the bombing counts.

The government, under the authority granted by 18 U.S.C. § 3576,[11] filed a notice of appeal from the sentence imposed by Judge Burke. DiFrancesco argues that the trial judge did not abuse his discretion in setting the sentence and, moreover, that such portion of § 3576 as authorizes the government to appeal a sentence where the defendant has not done so violates the double jeopardy clause of the fifth amendment.[12] Since the government's right to appeal and thus our jurisdiction to consider the merits of the sentence are dependent upon the constitutionality of the statutory provision, *see United States v. Wilson*, 420 U.S. 332, 339, 95 S.Ct. 1013, 43 L.Ed.2d 252 (1975), we must immediately confront the constitutional issue.[13]

11. 18 U.S.C. § 3576 provides:

With respect to the imposition, correction, or reduction of a sentence after proceedings under section 3575 of this chapter, a review of the sentence on the record of the sentencing court may be taken by the defendant or the United States to a court of appeals. Any review of the sentence taken by the United States shall be taken at least five days before expiration of the time for taking a review of the sentence or appeal of the conviction by the defendant and shall be diligently prosecuted. The sentencing court may, with or without motion and notice, extend the time for taking a review of the sentence for a period not to exceed thirty days from the expiration of the time otherwise prescribed by law. The court shall not extend the time for taking a review of the sentence by the United States after the time has expired. A court extending the time for taking a review of the sentence by the United States shall extend the time for taking a review of the sentence or appeal of the conviction by the defendant for the same period. The taking of a review of the sentence by the United States shall be deemed the taking of a review of the sentence and an appeal of the conviction by the defendant. Review of the sentence shall include review of whether the procedure employed was lawful, the findings made were clearly erroneous, or the sentencing court's discretion was abused. The court of appeals on review of the sentence may, after considering the record, including the entire presentence report, information submitted during the trial of such felony and the sentencing hearing, and the findings and reasons of the sentencing court, affirm the sentence, impose or direct the imposition of any sentence which the sentencing court could originally have imposed, or remand for further sentencing proceedings and imposition of sentence, except that a sentence may be made more severe only on review of the sentence taken by the United States and after hearing. Failure of the United States to take a review of the imposition of the sentence shall, upon review taken by the United States of the correction or reduction of the sentence, foreclose imposition of a sentence more severe than that previously imposed. Any withdrawal or dismissal of review of the sentence taken by the United States shall foreclose imposition of a sentence more severe than that reviewed but shall not otherwise foreclose the review of the sentence or the appeal of the conviction. The court of appeals shall state in writing the reasons for its disposition of the review of the sentence. Any review of the sentence taken by the United States may be dismissed on a showing of abuse of the right of the United States to take such review.

12. Although DiFrancesco asserts that § 3576 also runs afoul of the due process and equal protection clauses of the fifth amendment, he frames his argument solely in terms of double jeopardy. In light of our disposition of the double jeopardy claim, we need not consider whether other constitutional provisions might also prohibit the government's appeal.

13. Judge Haight argues in his opinion concurring in the result that § 3575 was inapplicable to DiFrancesco and that therefore it is unnecessary to reach the constitutional issue because (1) § 3575(f) provides that a defendant is "dangerous" "if a period of confinement longer than that provided for such felony is required . . ."; (2) § 3575(b) provides for a maximum term of twenty-five years; and (3) DiFrancesco already was subject, without use of the dangerous special offender sentencing provision, to a total sentence of forty years, consisting of consecutive twenty-year terms for each of the two counts of which he was convicted.

However, a defendant who has been convicted on more than one count comes before the

The concept of a government appeal to obtain an increase in a valid, enforceable sentence [14] was unknown to the American legal system throughout most of this nation's two hundred year history. Few states have given their appellate courts any power to increase a sentence, and in each instance where the power exists, it may be exercised only if the defendant has initiated the appellate proceeding by seeking review of the sentence.[15] The United States, prior to 1970, did not have statutory authority to seek an increase in a sentence. In that year, however, Congress enacted 18 U.S.C. § 3576, which provides that, in a case involving a dangerous special offender, "a review of the sentence on the record of the sentencing court may be taken by the defendant *or the United States* to a court of appeals." (Emphasis added.) The court of appeals is authorized to review "whether the procedure employed was lawful, the findings made were clearly erroneous, or the sentencing court's discretion was abused," and then to affirm the sentence, impose any sentence that the trial court could have imposed, or remand for further sentencing proceedings.

The government has not rushed to make use of its new power to seek review of sentences.[16] Whether this has resulted from doubts about the constitutionality of the procedure, an extraordinary degree of satisfaction with the sentences imposed under the dangerous special offender provision, a decision to allocate prosecutorial resources to other tasks, or other factors is of course only a matter of speculation, but this case is apparently the government's first attempt to obtain review of a sentence on appeal.[17] Moreover, the government's pri-

district court for sentencing on each of the counts for which he has been convicted. The determination whether a defendant is a "special offender" for the purpose of sentencing on each count depends upon whether the particular felony in question satisfies the requirements of § 3575(e). Moreover, the language of § 3575(f) refers to a need for confinement longer than that provided for the underlying "felony," not "felonies."

Therefore, the application of § 3575 depends on a particularized determination with regard to each of the felonies for which dangerous special offender sentencing is sought. Indeed, the district court did consider each of ·DiFrancesco's two convictions separately and imposed separate, albeit concurrent, sentences for them. Since the maximum sentence of twenty years for each of DiFrancesco's two felony convictions was less than the twenty-five year term available under § 3575, the district court properly could find that the statute was applicable.

We express no opinion as to whether § 3575 authorizes the imposition of consecutive sentences totaling more than twenty-five years.

14. Where the original sentence imposed by the trial court is invalid because of, *e. g.*, failure to impose a mandatory minimum penalty, the sentence may be corrected, even if doing so increases the punishment, because otherwise "no valid and enforceable sentence can be imposed at all." *Bozza v. United States*, 330 U.S. 160, 166, 67 S.Ct. 645, 649, 91 L.Ed. 818 (1947). Here, however, the sentence imposed by Judge Burke was within that legally authorized and thus is enforceable.

15. As of 1978, Alaska, Colorado, Connecticut, Maine, Maryland, Massachusetts, Montana and New Hampshire allowed appellate courts to increase a sentence, but only if the defendant sought review. Citations to these states' statutory provisions are collected in Dunsky, *The Constitutionality of Increasing Sentences on Appellate Review,* 69 J.Crim.L. & Criminology 19, 20 nn. 7–8 (1978). This court knows of no state which subsequently has authorized an increased sentence upon prosecutorial appeal.

16. Such power also exists under 21 U.S.C. § 849, a similar provision which deals with "dangerous special drug offenders." This provision also was enacted in 1970. Since that time, legislation has been introduced in Congress, as part of the proposed comprehensive revision of the federal criminal code, to extend the government's power to seek sentence review beyond the dangerous offender context to encompass all cases in which the sentence imposed by the district court varies by some preestablished degree from proposed sentencing guidelines. See, *e. g.*, § 3725 of the Criminal Code Reform Act of 1977, S. 1437, 95th Cong., 1st Sess. (1977). Such legislation has not been enacted.

17. The government has directed our attention to several other appellate decisions dealing with aspects of the dangerous special offender provisions. In none of these cases, however, did the government seek review of a sentence imposed under § 3575. Rather, the government has appealed a district court's refusal to sentence a defendant under the special provisions because, *e. g.*, the district court ruled that the government had failed to comply with § 3575's notice provision, *United States v. Ilac-*

mary response to DiFrancesco's attack on the constitutionality of § 3576 is not that government-instigated review of a final sentence is constitutional, but rather that the sentence imposed by the district court is merely "tentative" and that thus the defendant is not placed twice in jeopardy.

■ The language of the statute does not support the construction urged by the government. Section 3575(b) requires that, if the district court finds the defendant to be a dangerous special offender, it *"shall sentence* the defendant to imprisonment for an appropriate term not to exceed twenty-five years . . .." (Emphasis added.) This command is not tentative; the sentence imposed is effective immediately.[18] This procedure contrasts with that provided in, *e. g.*, 28 U.S.C. § 636(b)(1), whereby a trial judge may designate a magistrate to conduct a hearing in certain matters and to submit "proposed" findings and recommendations, which have no force until they have been reviewed by the judge, who may accept, reject or modify them. Nor is the procedure here similar to that provided in 18 U.S.C. § 4205(c) (formerly 18 U.S.C. § 4208(b)), to which it is compared by the government. Section 4205(c) allows a court that desires more information before imposing sentence to commit the defendant to the custody of the Attorney General for a period which will "be deemed to be for the maximum sentence of imprisonment prescribed by law." After the court obtains the desired information, it then may affirm the original commitment or impose a differ-

ent sentence which of course cannot exceed the aforementioned maximum prescribed term. "It is plain that as far as the sentence is concerned the original order entered under [§ 4205(c)] is wholly tentative," because "[t]he whole point of using [§ 4205(c)] is, in its own language, to get 'more detailed information as a basis for determining the sentence *to be imposed* . . . .' (Emphasis supplied.)" *United States v. Behrens*, 375 U.S. 162, 164–65, 84 S.Ct. 295, 296, 11 L.Ed.2d 224 (1963). In contrast, the commitment ordered by the district court pursuant to § 3575 is neither tentative nor merely a predicate to a sentence "to be imposed" by the court of appeals.

■ That Congress, as the government argues, could have written this statute in a manner analogous to § 4205(c) or in some other form which might not raise problems of double jeopardy is an inadequate response to the contention that the statute which Congress did write is constitutionally infirm. " '[A]ppeals by the Government in criminal cases are something unusual, exceptional, not favored,' at least in part because they always threaten to offend the policies behind the double-jeopardy prohibition." *Will v. United States*, 389 U.S. 90, 96, 88 S.Ct. 269, 274, 19 L.Ed.2d 305 (1967) (citations omitted). Therefore, we are obliged to construe strictly the procedure that Congress has authorized and to determine whether it, not some other, hypothetical procedure, offends the double jeopardy clause.[19]

qua 562 F.2d 399 (6th Cir. 1977), *cert. denied*, 435 U.S. 917, 98 S.Ct. 1473, 55 L.Ed.2d 509 (1978), or it held the statute to be unconstitutionally vague. *United States v. Stewart*, 531 F.2d 326 (6th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 376 (1976). In these cases, the court of appeals vacated the non-enhanced sentences imposed under the ordinary sentencing provisions and remanded for resentencing under § 3575. Although the defendants thereby were exposed to the possibility of an increased penalty upon resentencing, this danger resulted from their voluntary decisions to contest the use of § 3575 in the original proceedings. Thus, these previous cases did not involve the double jeopardy considerations raised by the government's attempt to appeal a

sentence actually imposed under § 3575. See text, *infra*, at 782.

18. DiFrancesco is presently incarcerated in federal prison at Atlanta, Georgia, serving the sentences imposed by Judge Pratt and Judge Burke.

19. We note that at least some of the alternative procedures suggested by the government would raise issues that Congress did not have to consider in enacting § 3576. For example, a system whereby the district court tentatively imposed the maximum permissible sentence with provision for review and possible reduction by the court of appeals would likely result in an appeal of the sentence being taken by the de-

The plain command of the fifth amendment is that no "person [shall] be subject for the same offense to be twice put in jeopardy of life or limb." Although the phrase "life or limb" suggests only the most serious of penalties, it has long been established that it encompasses all penalties which may be imposed in criminal proceedings. *Breed v. Jones,* 421 U.S. 519, 528, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975); *Ex parte Lange,* 85 U.S. (18 Wall.) 163, 170–73, 21 L.Ed. 872 (1873). A defendant who has stood trial and been convicted and sentenced by the district court has been placed once in jeopardy. Had the position advocated by Mr. Justice Holmes, dissenting in *Kepner v. United States,* 195 U.S. 100, 134, 24 S.Ct. 797, 49 L.Ed. 114 (1904), prevailed, the double jeopardy clause might present no barrier to an increased sentence on appeal. Justice Holmes argued that "logically and rationally a man cannot be said to be more than once in jeopardy in the same cause, however often he may be tried." But the Supreme Court has never adopted this concept of "continuing jeopardy," which, although it might have simplified the matter of government appeals, *United States v. Scott,* 437 U.S. 82, 90 n. 6, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978), would have greatly decreased the fifth amendment's protection against government oppression. The legislative history of § 3576 demonstrates that Congress was cognizant of possible constitutional objections to the provision, but that it concluded that *Kepner's* rejection of the continuing jeopardy concept should not apply to government appeal of a sentence rather than of an acquittal. S.Rep. No. 617, 91st Cong., 1st Sess. 95 (1969). We cannot perceive, however, how a defendant who, after being sentenced to several years' imprisonment by a district court, might be subject to imposition of a sentence of death upon a government appeal, would be any less placed twice in jeopardy of life or limb than was the defendant in *Kepner,* who, after acquittal in the court of first instance, was found guilty and sentenced to imprisonment for slightly less than two years upon appeal by the government. That § 3576 subjects a defendant "merely" to a longer term of imprisonment, not to the actual loss of his life, is a difference of degree, not principle, from the example given, for the double jeopardy clause applies equally to all criminal penalties. See *supra* at 783. Under the statute the government, dissatisfied with final judgment in one court, seeks a more favorable result in another tribunal. Therefore, the conclusion appears inescapable that to subject a defendant to the risk of substitution of a greater sentence, upon an appeal by the government, is to place him a second time "in jeopardy of life or limb."

Since this is the first attempt to use a statute allowing such an appeal, there are no precedents directly on point.[20] But the substantial body of double jeopardy case law, although hardly charting a straight-line path, *see, e. g., United States v. Scott, supra,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 overruling *United States v. Jenkins,* 420

fendant in every dangerous special offender case. This would increase the appellate caseload and in effect would reverse the usual presumption of finality which is accorded district court orders and judgments. Since we cannot know how Congress would weigh these additional considerations, we must reject the government's suggestion that a failure to read § 3576 in the light of possible alternatives will result in frustration of the Congressional intent.

We of course express no opinion as to the constitutionality of any alternative methods by which sentencing review might be accomplished.

**20.** The existing and proposed provisions for government appeal of sentences have generated a substantial amount of comment in the legal literature. Some commentators have argued that such provisions violate the guarantee against double jeopardy, *e. g.,* Spence, *The Federal Criminal Code Reform Act of 1977 and Prosecutorial Appeal of Sentences: Justice or Double Jeopardy?,* 37 Maryland L.Rev. 739 (1978); Note, *Twice in Jeopardy: Prosecutorial Appeals of Sentences,* 63 Virginia L.Rev. 325 (1977), while others have contended that the provisions would be constitutional, *e. g.,* Dunsky, *The Constitutionality of Increasing Sentences on Appellate Review,* 69 J.Crim.L. & Criminology 19 (1978), and at least one commentator has surveyed the competing arguments and concluded that "the answer is simply unclear." Low, *Special Offender Sentencing,* 8 Am.Crim.L.Q. 70, 91 (1970).

U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), supports the conclusion that we reach.

■ The guarantee against double jeopardy has been said to consist of three separate constitutional protections: (1) against a second prosecution for the same offense after acquittal; (2) against a second prosecution for the same offense after conviction; and (3) against multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).[21] The interests underlying these protections are similar. *United States v. Wilson, supra,* 420 U.S. at 343, 95 S.Ct. 1013. They promote the goal of preserving the integrity of final judgments, *Scott, supra,* 437 U.S. at 92, 98 S.Ct. 2187, and protect the individual against oppression by the government. *Id.* at 99, 98 S.Ct. 2187. More particularly, the protection against reprosecution after acquittal safeguards the individual against the embarrassment, expense and ordeal of repeated attempts by the government to use its resources and power to convict him and reduces the danger that an innocent defendant may be found guilty. *Serfass v. United States,* 420 U.S. 377, 387–88, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975); *Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). And, at the root of the second and third of these protections is the idea, especially relevant here, expressed in *Wilson, supra,* 420 U.S. at 343, 95 S.Ct. at 1021–1022:

When a defendant has been once convicted and punished for a particular crime,

principles of fairness and finality require that he not be subjected to the possibility of further punishment by being again tried or sentenced for the same offense. This concern was perhaps most clearly expressed in *Ex parte Lange, supra,* 85 U.S. (18 Wall.) at 183, 21 L.Ed. 872:

For of what avail is the constitutional protection against more than one trial if there can be any number of sentences pronounced on the same verdict? Why is it that, having once been tried and found guilty, he can never be tried again for that offence? Manifestly it is not the danger or jeopardy of being a second time found guilty. It is the punishment that would legally follow the second conviction which is the real danger guarded against by the Constitution. But if, after judgment has been rendered on the conviction, and the sentence of that judgment executed on the criminal, he can be again sentenced on that conviction to another and different punishment, or to endure the same punishment a second time, is the constitutional restriction of any value? Is not its intent and its spirit in such a case as much violated as if a new trial had been had, and on a second conviction a second punishment inflicted?

The argument seems to us irresistible, and we do not doubt that the Constitution was designed as much to prevent the criminal from being twice punished for the same offence as from being twice tried for it.

The prohibition against multiple punishment[22] has been so strongly felt that, al-

---

**21.** In addition, it is now clear that a defendant's "valued right to have his trial completed by a particular tribunal," *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), is also encompassed by the double jeopardy clause. *Crist v. Bretz,* 437 U.S. 28, 36, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978).

**22.** The principle that the double jeopardy clause bars multiple punishment has not been undermined by the Supreme Court's statements that the prohibition of the double jeopardy clause "is not against being twice punished, but against being twice put in jeopardy," *United States v. Ball,* 163 U.S. 662, 669, 16 S.Ct. 1192, 1194, 41 L.Ed. 300 (1896), and "is written

in terms of potential or risk of *trial* and conviction, not punishment." *Breed v. Jones,* 421 U.S. 519, 532, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (emphasis in original), *quoting Price v. Georgia,* 398 U.S. 323, 329, 90 S.Ct. 1757, 26 L.Ed. 200 (1970). In each of those cases, the Court was not limiting the scope of double jeopardy protection, but instead was rejecting arguments that the clause prohibited *only* multiple punishment. The Court held that the double jeopardy clause prohibits retrial where the defendant has been the subject of an express, *Ball,* or implied, *Price,* acquittal, or of a juvenile proceeding in which he was found guilty but where no disposition was entered. *Breed.*

though the question of increasing a valid sentence has never been squarely presented, numerous courts, including the Supreme Court, have emphatically stated in dictum that such a procedure would be impermissible. In *United States v. Benz,* 282 U.S. 304, 51 S.Ct. 113, 75 L.Ed. 354 (1931), the Court was confronted with the question whether a district court has the power, upon petition by a defendant, to reduce the sentence previously imposed on him. The Court noted the then-prevailing general rule that judgments, decrees and orders could be amended, modified or vacated by the court that made them, during the term at which they were made. It stated that this rule applied to criminal cases, "provided the punishment be not augmented," *id.* at 307, 51 S.Ct. at 114, and held that because the district court had decreased, not increased, the punishment, it had acted within its power.[23] The unanimous Court then stated that the distinction between decreasing and increasing a sentence was based "upon the ground that to increase the penalty is to subject the defendant to double punishment for the same offense in violation of the Fifth Amendment to the Constitution . . . ." *Id.*

In *Murphy v. Massachusetts,* 177 U.S. 155, 20 S.Ct. 639, 44 L.Ed. 711 (1900), the Supreme Court rejected the argument that the double jeopardy clause was offended when a defendant, whose original sentence had been vacated at his behest because the statute under which it was imposed was unlawfully applied, was resentenced under the appropriate statute to a term longer than the original one. The Court, however, distinguished the case before it from one in which "the [trial] court undertook to impose *in invitum* a second or additional sentence for the same offense, *or to substitute one sentence for another.*" *Id.* at 160, 20 S.Ct. at 641 (emphasis added). And again in *Reid v. Covert,* 354 U.S. 1, 37 n. 68, 77 S.Ct. 1222, 1241 n. 68, 1 L.Ed.2d 1188 (1957), Mr. Justice Black's plurality opinion, discussing the application of the Bill of Rights to military trials, stated:

In *Swaim v. United States,* 165 U.S. 553, 17 S.Ct. 448, 41 L.Ed. 823, this Court held that the President or commanding officer had power to return a case to a court-martial for an increase in sentence. If the double jeopardy provisions of the Fifth Amendment were applicable such a practice would be unconstitutional.

In *Walsh v. Picard,* 446 F.2d 1209 (1st Cir. 1971), *cert. denied,* 407 U.S. 921, 92 S.Ct. 2465, 32 L.Ed.2d 807 (1972), the court upheld the Massachusetts statute which allows a reviewing court to increase as well as decrease the sentence of a defendant who seeks sentence review. But the court explicitly noted that "the Massachusetts procedure does not permit the state to reopen the question of sentence on its own initiative. Were it to do so, it would of course violate the proscription against double jeopardy." *Id.* at 1211. Several other courts of appeal, including this one, have stated that a sentence may not be increased, at least where, as here, the punishment already has been partly suffered, *United States v. Chiarella,* 214 F.2d 838, 841 (2d Cir.), *cert. denied,* 348 U.S. 902, 75 S.Ct. 226, 99 L.Ed. 708 (1954); *Oxman v. United States,* 148 F.2d 750, 753 (8th Cir.), *cert. denied,* 325 U.S. 887, 65 S.Ct. 1569, 89 L.Ed. 2001 (1945); *Frankel v. United States,* 131 F.2d 756, 758 (6th Cir. 1942); *Rowley v. Welch,* 72 App. D.C. 351, 114 F.2d 499, 501 n. 3 (1940), and the defendant has not challenged the sentence. *United States v. Coke,* 404 F.2d 836, 845 (2d Cir. 1968) (en banc).

Although such dicta of course are not legally binding, their number and the high authority of their sources offer impressive evidence of the strength and prevalence of the view that the double jeopardy clause bars an increase in the sentence imposed by the district court.

The conclusion reached here does not conflict with the Supreme Court's decision in *North Carolina v. Pearce, supra,* 395 U.S.

**23.** Rule 35 of the Federal Rules of Criminal Procedure now permits a district court to reduce a sentence within 120 days after the sentence is imposed or the conviction is affirmed on appeal.

711, 89 S.Ct. 2072, 23 L.Ed.2d 656. There the Court held that the double jeopardy clause did not prohibit imposition of a greater sentence *on retrial* than had been imposed at the original trial of a defendant, *where the defendant succeeded in getting his first conviction set aside.* The Court relied in *Pearce* on *United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), which had established that "this constitutional guarantee imposes no limitations whatever upon the power to *retry* a defendant who has succeeded in getting his first conviction set aside," *Pearce, supra,* 395 U.S. at 720, 89 S.Ct. at 2078 (emphasis in original), and on *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919), which held that a corollary of that power to retry was the power to impose any legally authorized sentence.

Although various rationales have been advanced and rejected for the rule that a defendant may be retried after reversal of an original conviction, *see Burks v. United States,* 437 U.S. 1, 15 n. 9, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), the Court most recently adopted, in its unanimous opinion in *Burks, id.* at 15, 98 S.Ct. at 2149, the justification offered in *United States v. Tateo,* 377 U.S. 463, 466, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964):

> It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.

This rationale,[24] however, does not fully explain the result in *Pearce* since a defendant would not be granted immunity from punishment if the sentence on retrial were limited to that imposed at the first trial. Rather, *Pearce* depends too on a second line of reasoning, that the double jeopardy protection simply has no relevance where "the original conviction has, at the defendant's behest, been wholly nullified and the slate wiped clean." *Pearce, supra,* 395 U.S. at 721, 89 S.Ct. at 2078. This outcome does not result from any "waiver" of double jeopardy protections, as was suggested in *Trono v. United States,* 199 U.S. 521, 533, 26 S.Ct. 121, 50 L.Ed. 292 (1905), and rejected in *Green v. United States, supra,* 355 U.S. at 191–92, 78 S.Ct. 221, but instead is compelled by the fact that "the Double Jeopardy Clause, which guards against Government oppression, does not relieve a defendant from the consequences of his voluntary choice." *Scott, supra,* 437 U.S. at 99, 98 S.Ct. at 2198.

 Here, however, neither factor that militated against the application of the double jeopardy clause to resentencing in *Pearce* is present. There is not the slightest danger that DiFrancesco will go unpunished if the government's appeal is dismissed. The ten-year terms imposed on him by Judge Burke are valid and enforceable, and in fact are already being served. Moreover, DiFrancesco has made no "voluntary choice" that has subjected him to jeopardy for a second time. He faces the risk of an increased sentence solely because the government desires a second chance to obtain a sentence satisfactory to it.[25]

---

**24.** *Cf. Arizona v. Washington,* 434 U.S. 497, 509, 98 S.Ct. 824, 832, 54 L.Ed.2d 717 (1978) (failure to allow retrial after mistrial declared because of "manifest necessity" would deprive society of its "one complete opportunity to convict those who have violated its laws"); *Bozza v. United States,* 330 U.S. 160, 166, 67 S.Ct. 645, 649, 91 L.Ed. 818 (1947) (invalid sentence may be corrected even if doing so necessitates increase in punishment because otherwise "no valid and enforceable sentence can be imposed at all" and a convicted criminal will go free).

**25.** The government correctly does not contend that DiFrancesco has exposed himself to an increased sentence by appealing his conviction. Section 3576 distinguishes between an appeal of a conviction, which brings before us only the propriety of the process by which the defendant was convicted, and a review of a sentence. The statute allows the government to seek review of a sentence without regard to whether the defendant has chosen to appeal.

That it might be constitutionally permissible to impose consent to sentence review as a condition to exercise of a defendant's right to appeal, *cf. Walsh v. Picard,* 446 F.2d 1209 (1st Cir. 1971) (constitutional to allow increase as well as decrease in sentence when defendant petitions for sentence review), a question which we need not decide, is irrelevant here,

We do not deny the existence of legitimate governmental interests that might be served by allowing the government to appeal a sentence, *e. g.*, improved uniformity in sentencing. But such interests must be pursued in alternative ways that do not conflict with the fifth amendment's guarantee against double jeopardy. "[W]here [, as here,] the Double Jeopardy Clause is applicable, its sweep is absolute. There are no equities to be balanced, for the Clause has declared a constitutional policy, based on grounds which are not open to judicial examination." *Burks v. United States, supra,* 437 U.S. at 11 n. 6, 98 S.Ct. at 2147. To subject Eugene DiFrancesco for a second time to the risk of the entire range of penalties that the ,law provides for his crimes would violate that constitutional policy. The appeal by the government therefore must be dismissed.

The judgments of conviction are affirmed, and the appeal by the government is dismissed.

HAIGHT, District Judge (concurring in the result on the government's appeal).

I concur in Judge Smith's opinion affirming DiFrancesco's convictions, and agree that the government's appeal must be dismissed. However, I would base that dismissal upon the non-constitutional ground of the inapplicability of 18 U.S.C. § 3576 in the circumstances of this case.

In *United States v. Batchelder,* —— U.S. ——, ——, 99 S.Ct. 2198, 2199, 60 L.Ed.2d 755 (1979), the Supreme Court reiterated the maxim "that statutes should be construed to avoid constitutional questions," going on to state:

where § 3576 imposes no such condition. Considerations of due process would require that a defendant *be informed of such a consequence* of his decision to appeal.

1. Section 3575 provides:
 "(e) A defendant is a special offender for purposes of this section if—
 "(3) such felony was, or the defendant committed such felony in furtherance of, a conspiracy with three or more other persons to engage in a pattern of conduct criminal under

"This 'cardinal principle' of statutory construction . . . is appropriate only when an alternative interpretation is 'fairly possible' from the language of the statute. *Swain v. Pressley,* 430 U.S. 372, 378 n. 11, 97 S.Ct. 1224, 1228, 51 L.Ed.2d 411 (1977); see *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932); *United States v. Sullivan,* 332 U.S. 689, 693, 68 S.Ct. 331, 334, 92 L.Ed. 297 (1948); *Shapiro v. United States,* 335 U.S. 1, 31, 68 S.Ct. 1375, 1391, 92 L.Ed. 1787 (1948)."

While neither DiFrancesco nor the government raised the issue below, this "cardinal principle" of statutory construction permits a court to consider *sua sponte* whether the sentencing procedures in §§ 3575 and 3576 can be interpreted so as to avoid the constitutional question. Clearly such an interpretation is "fairly possible" from the language of the statute.

Governmental appeal of a sentence under § 3576 is available only in respect of an individual properly proceeded against in the district court as a "dangerous special offender" under § 3575(a). To come within the statute, the offender must be both "special" as defined by § 3575(e), and "dangerous" as defined by § 3575(f). DiFrancesco qualifies as "special" under § 3575(e)(3).[1] He is "dangerous" under § 3575(f) if, and only if, "a period of confinement *longer than that provided for such felony* is required for the protection of the public from further criminal conduct by the defendant." (emphasis added).

Section 3575(b) provides in pertinent part:

"If it appears by a preponderance of the information, including information sub-

applicable laws of any jurisdiction, and the defendant did, or agreed that he would, initiate, *organize, plan, finance, direct, manage,* or supervise all or part of such conspiracy or conduct, or give or receive a bribe or use force as all or part of such conduct."
The district court found that the conspiratorial elements of the crimes for which DiFrancesco was convicted satisfied the requirements of the statute. A.51–56.

mitted during the trial of such felony and the sentencing hearing and so much of the presentence report as the court relies upon, that the defendant is a dangerous special offender, the court shall sentence the defendant to imprisonment for an appropriate term not to exceed twenty-five years and not disproportionate in severity to the maximum term otherwise authorized by law for such felony. Otherwise it shall sentence the defendant in accordance with the law prescribing penalties for such felony."

I construe the statute to provide the district judge with an additional capacity to impose a sentence of up to twenty-five years in cases where the underlying statute, standing alone, would not permit a term of such duration. Stated conversely, if the period of confinement provided for the felo-

ny by the underlying statute equals or exceeds twenty-five years, the dangerous special offender statute has no office to perform.[2]

If that is the proper interpretation of the dangerous special offender statute, it could not apply to DiFrancesco. DiFrancesco was prosecuted under the racketeering statute, 18 U.S.C. §§ 1961 *et seq.* He was convicted of a substantive offense under § 1962(c),[3] and conspiracy under § 1962(d).[4] The district court had the unquestioned power under the underlying statute, entirely without regard to the dangerous special offender statute, to sentence DiFrancesco to two consecutive 20 year terms, for a total of 40 years,[5] or 15 years longer than the maximum term permitted by § 3576. The district court's discretionary power to impose consecutive, rather than concurrent, sen-

**2.** The legislative history is not voluminous on the point, but such indications as there are favor this interpretation. The Assistant Attorney General, Criminal Division, writing to the House Judiciary Committee on the wording of § 3575(b), and particularly on the point of whether the statute should read "shall" sentence or "may" sentence, said in part:

"We think that the term 'shall' as used here is appropriate. It conforms with the language generally used in the sentencing provisions of title 18, which has not previously been misconstrued as providing for a mandatory minimum sentence. Furthermore, inasmuch as an offender in any of the three defined categories is to be considered 'dangerous' *only when the court finds that a longer prison term than that which may be imposed for the felony of which he has been convicted* is required to protect the public from further criminal conduct on his part, it would be incongruous for the court to fail to sentence a 'dangerous' offender to any prison term at all. Therefore, a provision that some such term of imprisonment 'shall' be imposed is appropriate for the purposes of the title. *If a court finds that the usual maximum term for the felony, or any lesser term, is all that should be imposed, by definition the court could not find the defendant to be a dangerous special offender.* The proposed change from 'shall' to 'may' therefore, would serve no purpose." 2 U.S.Code Cong. & Admin. News, pp. 4007, 4065–6 (1970) (emphasis added).

The House Report says of § 3575(f):
"Subsection (f) provides that a defendant is 'dangerous' if confinement longer than that

ordinarily provided is required to protect the public from further crime by him." *Id.* at 4039.

I construe the phrase "ordinarily provided" to mean the penalties provided by the underlying felony statute.

**3.** That section provides:
"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

**4.** That section provides:
"It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

**5.** 18 U.S.C. § 1963 provides in pertinent part:
"(a) Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962."

tences upon a defendant convicted on more than one count has been recognized for so long[6] that it may fairly be regarded as inherent in the "period of confinement . . provided for such felony" by the underlying statute. In urging sentencing judges to impose consecutive sentences where the circumstances permit, prosecutors can and frequently do make the same arguments (the defendant is dangerous, the public must be protected) that the dangerous special offender statute contemplates.

Such arguments could have been made in the case at bar, and a sentence passed in excess of the maximum permitted by § 3576, entirely on the basis of the underlying felony statute, and the district court's well-established discretionary power to impose separate sentences on separate counts and make them run consecutively. I interpret §§ 3575 and 3576 to be inapplicable in those circumstances and would dismiss the government's appeal on that ground, leaving the constitutional question for a case in which it cannot be avoided.[7]

---

6. See United States v. Daugherty, 269 U.S. 360, 363, 46 S.Ct. 156, 70 L.Ed. 309 (1926), adopting the reasoning of Neely v. United States, 2 F.2d 849, 852–3 (2d Cir. 1924), which in turn relied upon the statement in Ex parte DeBara, 179 U.S. 316, 322, 21 S.Ct. 110, 113, 45 L.Ed. 207 (1900) that a court, by exercising such sentencing options, "may express its views of the criminality of a defendant . . . ."

I do not find in the legislative history of the special dangerous offender act specific refer-

ence to the trial judge's ability to impose consecutive sentences in multiple count indictments, but the Congress must surely have been aware of so established a power.

7. If my interpretation of the statute is wrong, and the constitutional question is unavoidably presented by this case, then I am in complete agreement with Judge Smith's scholarly demonstration that the statute violates the double jeopardy clause of the fifth amendment.